WILLIAM TOWNSHEND AND OTHERS, vs. JEREMIAH TOWNSHEND AND JOHN B. BROOKE, EXC'RS OF JOHN TOWNSHEND.—June 1851.

Issues framed upon a *caveat* to a will, and sent by the orphans court to the county court for trial, may be removed to any adjoining county for trial.

An attesting witness to a will declared, on the same day that the will was executed, that he did not believe the testator to be, at the time he executed the will, a sane person, and that he signed the will as a witness, merely to gratify the testator. HELD: that these declarations, (the witness being dead,) are properly admissible in evidence.

The attestation of a witness to a will, imports all that is requisite to make the will good and valid, so far as his signature can go, and his declarations, (the witness being dead,) are admissible to impeach these presumptions of law.

APPEAL from *Anne Arundel* county court.

On the 8th of June, 1846, the appellants, who are next of kin of *John Townshend*, late of *Prince George's* county, deceased, filed, in the orphans court of said county, a *caveat* against the admission to probate of a paper purporting to be the last will and testament of said deceased, executed on the 17th of December, 1844, and offered for probate by the appellees, the executors therein named, on the 15th of May, 1846. The executors answered the *caveat*, and thereupon the said orphans court directed certain issues, framed by the *caveators*, to be sent to *Prince George's* county court for trial. At the first trial in said county, the jury could not agree, and were dis-

charged. On the second trial, the jury rendered a verdict for the caveators, and the county court adjudged the record to be transmitted to the orphans court, with costs to the caveators. The caveatees, having excepted to various opinions and instructions given by the court in the progress of the trial, appealed, and this court, at its December term, 1848, reversed this judgment, and remitted the record to *Prince George's* county court, by writ of *procedendo.* The proceedings on this appeal are reported in 7 *Gill,* 10, where the paper purporting to be the will, and the several issues will be found in full.

This alleged will was executed in presence of *Philemon Chew, Walter B. C. Worthington* and *James J. Chew,* and by it the testator confirms a deed, executed by him, on the 24th of December, 1831, manumitting his slaves, and to remove all doubts as to the validity of this deed, he bequeaths freedom to all his slaves, he also devised to his said slaves and their increase, all his property, " both real and personal, to be divided amongst them equally, share and share alike, to them and their heirs forever."

The cause being thus remanded to *Prince George's* county court, at April term, 1850, of said court, upon the suggestion of the caveatees, that a fair trial could not be had in that court, the record was ordered to be transmitted to *Anne Arrundel* county court, for trial of said issues, and at April term of the latter court, when the case was called, the caveators moved that the proceedings be remanded to *Prince George's* county court, on the ground that the act of removal was illegal, said last mentioned court having no right to remove issues sent to it from the orphans court to a court without their judicial district, the case of issues from the orphans court not being embraced by the provisions of the act of 1804, ch. 55. But *Anne Arrundel* county court, (WILKINSON and BREWER, A. J.,) overruled the motion and tried the cause.

In the course of the trial, three exceptions were taken, one by the caveators, and two by the caveatees. The 1st issue was the one chiefly relied on, viz: "Whether the said *John Townshend,* at the time of signing said paper or instrument of writing,

purporting to be his last will and testament, was of sound and disposing mind, and capable of executing a valid deed or contract?" And the caveators endeavored to prove, that in reference to his negroes and the disposition of his property by last will, he labored under a delusion, and that the paper propounded as his last will and testament was the immediate result of such delusion.

1st EXCEPTION. By the caveatees. This exception states, that the caveators, after reading to the jury the paper propounded as the last will and testament of *John Townshend,* decased, admitted to be in the handwriting of *John B. Brooke,* one of the caveatees, called up their witnesses to be sworn, and amongst others, *Michael B. Carroll.* The caveatees required said *Carroll* to be sworn on his *voir dire,* and being so sworn, the caveatees asked him whether he had any interest in the event of this suit. He answered that he had not. The caveatees then proposed to examine him further and more particu-. larly, for the purpose of showing that he was really interested in the event of the suit. But the court refused to permit such further examination, being of opinion that he had answered the only question which could be put to him on his *voir dire,* and ordered said witness to be sworn in chief, and he was accordingly so sworn. The caveatees excepted.

2nd EXCEPTION. By the caveatees. States, that said *Carroll* having been so sworn in chief, was examined as a witness on the part of the caveators, and proved various facts and circumstances, tending to prove the issues on their part. On cross-examination, the witness proved, that on the 13th of October, 1840, *John L. Townshend,* one of the caveators, applied for the benefit of the insolvent laws. That witness was, at the time of said application, a creditor of said insolvent. That afterwards, other dealings took place between witness and the insolvent, in pursuance of an agreement then made between them, that if witness would advance him money and goods, he, the insolvent, would, at a future time, secure witness as well for his former debt as for said debt newly contracted, and the insolvent became indebted to the witness in the further sum

of $200, or thereabouts, and that several years afterwards, the insolvent secured both debts, by conveying to witness two negroes, by an absolute bill of sale, and witness thereupon delivered up the note for the old debt.

The caveatees thereupon objected to the competency of said witness, and prayed the court to exclude all his testimony from the jury. But on further examination, witness declared, that he looked to said negroes as his only security for payment of said debts, and that he had no claim as a creditor against the estate of said insolvent, which had come, or should come, to the hands of his trustee, and thereupon executed a release to said *John L. Townshend*, of all and every claim and interest which he had, or may, in any event, by possibility have in the estate which has vested in his trustee, or which may hereafter vest in said trustee, for the benefit of the creditors of said *John L. Townshend;* " The object and end of this release is to divest myself of any and all interest in the estate, which, under the said application, has vested in such trustee, for the benefit of the creditors of said *John L. Townshend*, or which, subsequent to said application, may have accrued in right of said *John L. Townshend*, by gift, descent, devise, or in any course of distribution, or which may or shall hereafter so accrue. And if, from any cause, this release cannot operate to divest me of such claim and interest, then, for value received, I assign, transfer and make over to the said *John L. Townshend*, all my rights, present and future, in or upon the assets which have vested, or which may vest in such trustee, under said application, in respect of any claim which I may have against said *John L. Townshend*, which accrued or was created prior to his said application. But this instrument is sealed and delivered by me, with a reservation of all and any claims which I may have against said *John L. Townshend*, created since said application, and also with a reservation of my rights and property in and to certain negroes heretofore conveyed to me, by bill of sale, by said *John L. Townshend*, and which bill of sale is of record in *Prince George's* county."

And witness being further examined, stated, that one of said

negroes, named *Charles*, formerly belonged to said insolvent before his application, and had been conveyed by him, by bill of sale, to one *James Baden*, to secure a debt of $500; and that after his discharge, the insolvent paid said debt to *Baden*, and got back said negro, and had conveyed him to the witness, as before stated, *Baden* having previously declared to witness, that he had no claim upon the negro, and that his debt had been fully paid. The witness stated, that the other negro, after the discharge of the insolvent, was obtained by *Townshend* from *Baden*, upon an exchange for another negro, which said negro, so given in exchange by *Townshend* to *Baden*, had, before his application, been given by *Baden* to the wife of said insolvent, who was *Baden's* daughter. But whether said negro had been so given by *Baden* to his daughter, absolutely or not, he does not know. He knows that said negro had belonged to *Baden*, and he also knows that said negro was in *Townshend's* possession at the time of his application. He also knows, that after *Townshend's* application, said negro remained in his possession until the exchange of negroes between the parties was made, as aforesaid; and he also knows, that before said application, the wife of *Townshend* claimed said negroes as given her by her father.

The court thereupon overruled the objection, and were of opinion that *Carroll* was a competent witness for the caveators, and refused to exclude his testimony from the jury. The caveatees excepted.

After the cause had been, in part, argued before the jury, the bill of sale referred to by *Carroll* was produced, and read to the jury, by consent of parties, and proved to be a mortgage of the two negroes spoken of in *Carroll's* testimony, executed on the 11th of April, 1846, by *John L. Townshend* to *Carroll*, to secure an indebtedness from the former to the latter, consisting of two sums, one of $192.50, with interest from the 21st of December, 1839; the other, of $136.23, with interest from the 1st of January, 1841, for each of which a judgment had been entered in *Prince George's* county court. The condition of this mortgage was, that the grantor should pay the said

sums within three years, and in the meantime the mortgagor was to have possession of the negroes.

3RD. EXCEPTION. By the caveators. The caveators further proved by numerous competent winesses, that they knew the said *John Townshend* in his life time, some of them having known him for thirty years, others for only a short period, and others for many years, before his death. And that said *Townshend* at the time of his decease, was a very aged man, that during the whole period of their knowledge of him he was accustomed to speak of himself as a spiritualized man, that he was not in flesh, but that he had died and risen from the dead; that he spoke of himself as a person who was to live for the term of five hundred years; that he represented that at all times there was on earth one person who was peculiar and unlike other persons, and that he was such peculiar person then living on the earth; that he had frequent personal interviews and conversations with *God Almighty*, and was accustomed to receive immediately from *God,* directions, instructions and commands, in relation to what he should do, and what he should not do; that he stated that many years ago, he had engaged himself to a girl to be married, and had obtained her father's consent to the proposed union, but that as he was returning home after the engagement, *God* spoke to him or inquired of him, "*Jackey* where have you been, and what have you been about?" that he answered and stated that he had been courting and had engaged himself to be married, that *God* then asked him whether he had made a stipulation to have the right to return her to her father, if on trial he should find that she did not suit him? and that upon answering in the negative, he was directed to return to the house of her father, and insist on a stipulation to this effect, and that he thereupon did return to the house of the father of his intended bride, and proposed to him to include such stipulation in the agreement, and was so rudely repulsed, that he never afterwards made any attempt to marry. That said *Townshend* in his conversations with some of said witnesses stated that he was at one time troubled very much with rats, and that he had provided cats and dogs to destroy

them, that *God* ordered him to put away all his cats and dogs, that he himself remonstrated and insisted that if he put away his cats and dogs, the rats would eat him up, that *God* thereupon agreed to make a bargain, and did stipulate that if he, *Townshend,* would put away the cats and dogs, he would see that the rats did not do him harm for a certain specified period, that he accordingly did put away his cats and dogs, and *God* did protect him for the stipulated period from any annoyance from the rats. That said *Townshend* stated that he had been present at the judgment of *men,* and that he had seen the different sects come up in order, that he had seen his brother *Bill* amongst the crowd of men there present, and that he had pressed himself so as to be amongst the foremost of the crowd there present, and he was in fact amongst the catholics and episcopalians, but *God* ordered him to go back amongst the methodists. The catholics, episcopalians and some others were allowed to pass on, but when the crowd of methodists came on, *God* caught them by their neck, as persons would catch a flock of goslins, or a number of porter bottles by the neck, and hurled them away off, and they went down out of sight. They also proved by some of the said witnesses, that said *Townshend* represented that at a closely contested election, he had intended to vote the democratic ticket, to which party he professed to belong, and in the success of which party at said election he professed and seemed to have a deep interest, that he stated that he did not vote, and could not vote at said election for said ticket, because as he stated, *God* had commanded him not to do so; that *God* had asked him if he was going to vote for the democrats, and that he, *Townshend,* had stated that he so designed, that *God* then told him, that he himself was a democrat, and had voted the democratic ticket, but that he had determined at that election not to vote at all, that the democrats had become like a saw that had grown dull, and needed filing, and that he meant to let the whigs succeed that year, that they might act as a file upon the saw, and that in consequence of this communication, he actually abstained from voting. The caveators also proved by said witnesses, that

said *Townshend* professed very frequently to have seen *God* face to face, as a man sees his fellow, that he had talked very frequently with *God*, and had audibly heard *God* speaking to him, that he quarrelled with *God*, and had given back as good as he sent, that he had on one occasion in a dispute between them, struck *God* with a stick, that at one time he was going to camp-meeting, and *God* asked him, *"Jackey* where are you going?" that he had answered that he was going to *Nottingham*, that *God* said he knew better, that he, *Townshend*, was going to camp meeting, that he, *Townshend*, thereupon took the road towards *Nottingham*, and *God* took the road up the creek, and when he, *Townshend*, found that he had outwitted him, he cut across through the woods from the *Nottingham* road to the camp-meeting road, and went to the camp-meeting. The caveators also proved by said witnesses, that said *Townshend* stated that *God* had commanded him to set his negroes free, and to give them all his property, that he had told him this repeatedly, that at one time he, *Townshend*, intended to convey a piece of land to one of his nephews, and that *God* had told him that he must not do so, but must give it to his negroes: these statements were made by said *Townshend* at different times, during many years before the date of his alleged will and afterwards, and that in speaking of his said alleged will, he said that it was not his will, but *God's* will; that if he could have disposed of his property as he wished, he would have left it to his relations, but that he was not a free agent, that he was a mere overseer, and that he believed his eternal salvation depended on his compliance with the directions he had received; some of the said witnesses stated that said declarations and statements of said *Townshend*, were gravely and seriously made, and apparently with sincerity and under a conviction of their truth, and they stated that they did not consider him a sane man in any matters of religion, and in relation to the disposal of his negroes and other property.

The caveatees on their part, proved by competent witnesses, that the said *John Townshend* was of sound and disposing mind, and capable of making a valid deed or contract, and of

65    v.9

managing and disposing of his property; that they had known him for many years, one of them having been for many years his family physician, and others having been his near neighbours from early youth; that they had frequently conversed with him and had heard him converse with others. That he devoted much time to the reading of the holy scriptures and thought he was deeply versed therein, and that he was fond of exhibiting his knowledge of religious subjects, and of disputing on such subjects with any who would engage in controversy with him. That his opinions as expressed by him at different times were *entirely* different, and, in said witnesses' opinions, were not seriously entertained by him, but were professed on the occasion for the purpose of disputation, or to excite attention and astonishment; and further proved, that in matters of business, his religious professions did not affect his conduct. And said witnesses, in view of all this knowledge of said *Townshend*, were of opinion that he was of sound and disposing mind, and capable of making a last will and testament, such as is propounded in the cause. And further read to the jury various deeds executed during thirty years preceding the death of said *Townshend*, in which he was either a party grantor or grantee, conveying both real and personal estate. That he was appointed trustee by *Prince George's* county court sitting in equity, and as such trustee conveyed real estate to two of the caveators. That he conveyed property by deed to another of the caveators who also conveyed by deed real estate to him, *Townshend*, in fee. That he had acknowledged a deed conveying real estate before one of the caveators then a justice of the peace. They also read the deed of manumission referred to in the will, executed on the 24th of December 1831, by which he liberated and set free all his negroes, thirty-five in number, naming them and specifying their respective ages, with their increase from and after his death. This deed was duly executed, acknowledged and recorded.

The caveators, in the course of their examination, had proved that *Philemon Chew*, from the year 1815, to the year

1823, was engaged in business as a merchant at *Nottingham*, in *Prince George's* county, and from 1815 to 1828, was engaged in purchasing tobacco on his own account, or on commission, that from 1815 to 1828, he purchased the tobacco raised by said *Townshend*, and that the latter purchased his annual supplies from said *Chew* during all the time said *Chew* was engaged in business as aforesaid; that said *Chew* and *Townshend* were on intimate terms, and that in December 1831, the said *Chew*, returning from *Annapolis* to *Nottingham* had an interview in this last place with the said *Townshend*; that the said *Townshend* had frequently informed the said *Chew* of his intention to manumit his negroes, and advised with him as to the mode of executing his intention, and that upon the occasion of said interview, the said *Chew* stated to said *Townshend* that it was very probable the legislature, at its then next session, would pass some act affecting the right of the master to manumit his slaves, and advised and urged said *Townshend* forthwith to see the said *John B. Brooke*, his legal counsel, and procure him to prepare a deed of manumission to be executed, so that he, the said *Townshend*, might get ahead of any action of the legislature on the subject, and that in consequence of said information and advice, said *Townshend* did see the said *Brooke*, who prepared said deed of manumission, and the same was executed under the direction and by advice of said *Brooke*.

The caveatees also proved by *James J. Chew*, a competent witness, that he witnessed the execution of the said paper writing as one of the witnesses to the same, that it was executed by the testator in *Upper Marlborough*, in the office of the register of wills of *Prince George's* county, he, the witness, then being a deputy of the register, and it was witnessed by *Philemon Chew*, the register at that time, by *Walter B. C. Worthington*, who was casually present in said office, and by him, the witness; that the will was not read, nor its contents explained, in the hearing of witness; witness signed it at the request of said *Townshend; Mr. John B. Brooke* was with *Townshend* at the time; witness had no acquaintance with

*Mr. Townshend* at the time, and cannot speak at all as to his mental capacity.

The caveators had before, in their examination of witnesses produced on their part, proved that *Philemon Chew* was a person of high character, and was well acquainted with said *Townshend* for many years, and was his commission merchant for the disposal of his tobacco for many years. And the caveatees proved, without objection on the part of the caveators, that the said *Walter B. C. Worthington* was the partner of said *Philemon Chew*, in the tobacco business, and was a person of high character, and that since the execution of said paper, both said *Philemon Chew* and said *Walter B. C. Worthington* have departed this life. The counsel of the caveatees, in answer to an inquiry as to what use they meant to make of the fact of attestation of said *Chew*, and of said *Worthington* and each or either of them, stated that they meant to rely on said attestation, and each of them, as evidence in the cause, for all purposes for which the same were legally admissible.

The caveators then offered to prove by *Michael B. Carroll*, who had been decided to be a competent witness by the court, to which decision an exception had been taken, that he was well acquainted with the said *Walter B. C. Worthington* in his lifetime; that he had met with said *Worthington* in the town of *Nottingham*, nine miles from *Upper Marlborough*, aforesaid, on the evening of the same day that said paper writing or will was executed, and after the same had been executed, and that said *Worthington* then stated to witness that he had witnessed said will, and that he did not believe said *Townshend* to be, at the time he executed said will, a sane person, and that he had signed said will as a witness, merely to gratify said *Townshend*. It was admitted by the caveators that said *Townshend* was not present when the statements so proposed to be proved, as made by said *Worthington*, were made, and they stated their object to be in offering the said evidence to rely upon the same, if received as evidence before the jury, to rebut the *prima facie* evidence imparted by the attestation of said *Worthington* of the testator's sanity. But the

caveatees by their counsel, objected to the said evidence, on the ground that the same was mere hearsay, and not admissible evidence to go to the jury. And the court sustained the objection, and refused to permit said evidence to be given, and excluded the same from the jury. The caveators excepted.

The jury rendered a verdict on all the issues for the caveatees. Whereupon the caveators moved the court to set aside the verdict and grant a new trial for the following reasons.

1st. Because the verdict is against the evidence in the cause.

2nd. Because the verdict is against the weight of evidence in the cause.

3rd. Because at the time of calling the jury and taking the verdict, the foreman in answer to the question as to the finding on the second issue, stated that the jury had not considered and passed upon any of the issues except the first, and thereupon without consideration with his fellow-jurors, rendered a verdict for the caveatees upon all the issues, whereas there was evidence offered at the trial by the caveators, tending to prove other of said issues than the first.

4th. That the court erred in excluding from the jury the evidence offered by the caveators, to be proved by the witness, of the declaration of *Walter B. C. Worthington,* one of the subscribing witnesses to the will, made on the day the said will was signed, impugning the sanity of mind of the said *John Townshend,* at the time of making the said will, and which declarations were offered for the purpose of rebutting the *prima facie* effect of said attestation of said *Worthington,*

The court overruled this motion, and gave judgment against the caveators for costs, and ordered the verdict of the jury to be certified to the orphans court, &c. The caveators appealed.

The cause was argued before SPENCE, MARTIN and FRICK, J.

TUCK and CAUSIN for the appellants, upon the question of jurisdiction, contended:

1st. That independent of the act of 1804, ch. 55, confirmed by the act of 1805, ch. 16, the county courts of the

several judicial districts of the State, have no authority to direct the removal of cases to any other county court.

2nd. That the provisions of the said acts authorising removals, do not embrace the case of issues sent from the orphans courts to the county courts for trial, that therefore *Anne Arundel* county court erred in assuming jurisdiction on the case.

Upon the point raised in the bill of exceptions, they contended that the court erred in refusing to permit the declarations of *Worthington* to be given to the jury.

1st. Because the fact of attestation *involves* the inference of sanity of the testator at the time of the executing of the will.

2nd. Because in the event that the witness was living at the time of trial, it would have been competent for the caveators in the court below, to have rebutted such inference by the testimony of the attesting witness himself.

3rd. That the fact of the death of the witness, should not, in this particular, prejudice the appellants, because the attestation may be regarded as merely a presumed declaration of his opinion of the testator's sanity, and in such view, the declarations offered below were of equivalent force, and should have been submitted to the jury to be weighed by them.

4th. Because if the attesting witness had been alive, and upon examination had declared his belief in the sanity of the testator at the time of attestation, it would have been competent for the caveators below, to have offered the declarations in question, in order to contradict said witness and destroy the force of his opinion, and that the attestation taking the place of such oral declarations, should, on principle, and for purposes of justice, be liable to a similar rebuttal. And the more especially, as in this case the counsel for the caveatees stated, that they should so use the evidence of attestation before the jury.

PRATT and ALEXANDER, for the appellees, insisted:

1st. That the proceedings were properly removed from *Prince George's* county court to *Anne Arundel* county court, for trial. That those issues are not a *suit* or *action at law*,

commenced or instituted in *Prince George's* county court, within the provisions of the constitutional act of 1804, ch. 55, sec. 2. And that even in reference to suits and actions at law, the act of 1849, ch. 518, in so far as it authorises a removal to any adjoining county, is a *further* remedy, and is therefore warranted by the said act of 1804,

2nd. That the motion for a new trial, and especially upon the ground covered by the bill of exceptions, was a waiver of said bill of exceptions.

3rd. That the declarations of *Walter B. C. Worthington*, tendered in evidence, as shown in the appellant's exception, would have been inadmissible, even if it had been proposed to prove them by a competent witness.

4th. That *Michael B. Carroll*, the witness, tendered to prove said declarations, was interested in the event of this suit, and therefore incompetent as a witness, to prove the same.

MARTIN, J. dissented, and delivered the following opinion:

In this case I dissent from that part of the opinion of a majority of the court, in which it is held that the declarations of *Walter B. C. Worthington*, were admissible in evidence. The true doctrine on the question of the admissibility of these declarations, is to be found, I think, in the opinion of the court of exchequer, in the case of *Stobart vs. Dryden*, 1 *Mees. and Welsby*, 614.

FRICK, J., delivered the opinion of this court.

In this case we think the court properly overruled the motion to remand it to *Prince George's* county court; and the majority of the court are of opinion that the declarations of *Walter B. C. Worthington*, were properly admissible in evidence, and that consequently the court erred in excluding them from the jury. The question is not clearly settled by the books, but the weight of authority, they think, is decidedly in favor of this decision. The only case referred to by counsel, or that we can find which would seem to impeach it, is the case of

*Stobart vs. Dryden*, 1 *Mees. and Welsby*, 614, where it was held that the defendant could not give evidence of the declaration of a deceased witness, tending to show that he had forged or fraudulently altered the deed.   The general rule in exclusion of hearsay testimony, is not to be questioned; but in this very case here referred to, the inquiry was, whether it was or not, one of the exceptions to the rule, always recognized upon the ground of necessity or convenience?   Now in the case before us, where the attestation of the witness, (now dead,) imparts all that is requisite to make the will good and valid, so far as his signature can go, not only convenience and necessity, but justice would seem to require that his declarations, (in this case almost simultaneous with the act,) should be admitted to impeach these presumptions of law.   And in looking upon this as an exception to the general rule, we think we are supported by the cases of *Wright and Littler*, 3 *Burr.*, 1255. *Doe vs. Ridgeway*, 4 *Burn. and Ald.*, 55.   *Walker vs. Stephenson*, 3 *Esp.*, 284, recognized by *Lord Ellenborough*, in 6 *East.*, 195.   5 *Bing.*, 435.   2 *Bailey S. C. Rep.*, 128. 3 *Yeates*, 506.   2. *Hill. Rep.*, 609.   2 *Paige*, 147.   1 *Harrington*, 109, and 9 *Barr. Penn. Rep.*, 151, *Harden vs. Hays.*

For the purposes of this opinion, the court think that *Carroll* is to be considered a competent witness to prove such declarations, the court below having so ruled, and there being no appeal by the appellees from their decision.   The judgment is therefore reversed, and procedendo awarded.

JUDGMENT REVERSED, AND

PROCEDENDO AWARDED.