(Decided April 21st, 1864.)

√

---

JOHN HIGHBERGER & WIFE, & OTHERS, *vs.* SARAH STIFFLER.

WITNESS—COMPETENCY AND CREDIBILITY OF.—The grand-children of a grantor are not incompetent to testify to facts tending to set aside a deed for incapacity in the grantor. The objection goes to their credibility rather than their competency, their interest being contingent not certain.

To render the person called, incompetent as a witness, he must have a legal interest, a direct and certain interest in the event of the suit, inclining him against the party objecting.

————: JUSTICE OF THE PEACE.—It is certainly against the policy of the law, that justices of the peace should be permitted to contradict as witnesses, what they had officially certified to as magistrates. To that extent they are incompetent as witnesses. But beyond this, there is no rule of

law which precludes them from testifying to facts which do not contradict their official certificates, although those facts may incidentally operate on the legal effect of the instrument acknowledged before them.

They may testify to the age and health of the grantor, the payment or non-payment of the consideration money, the reading or omission to read the instrument, or other collateral facts not conflicting with what they had certified.

ATTESTING WITNESS, COMPETENCY AND CREDIBILITY OF.—The rules of evidence which incapacitated attesting witnesses from impeaching instruments to which their signatures had given credit, have been relaxed and abandoned, although such evidence is to be received with much jealousy.

FRAUD:—UNDUE INFLUENCE:—FIDUCIARY RELATION.—Wherever a fiduciary relation exists, legal or actual, whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of Equity, independent of the ingredients of positive fraud, through public policy, as a protection against over-weening confidence, will interpose to prevent a man from stripping himself of his property.

——: ——: ——: PARENT AND CHILD.—All contracts and conveyances whereby benefits are secured by children to their parents, are objects of jealousy; and if they are not entered into with scrupulous good faith, and are not reasonable under the circumstances, they will be set aside, unless third persons have acquired an interest under them; especially where the original purposes for which they have been obtained, are perverted or used as a cover. And the same principles are applied to persons standing in the situation of *quasi* guardians, or confidential advisers.

The same principles also will apply where the natural position of the parties is reversed by the influence of time, and the *parent has become a child,* and the child is guardian to the parent.

In such cases it is not necessary to prove the actual exercise of over-weening influence, misrepresentation, importunity, or fraud, *aliunde* the act complained of.

LACHES.—Where a deed was executed on the 7th of April 1849, in a manner and under circumstances that would compel a Court of Equity to declare it improvident and voidable at the option of the grantor; and the influences and infirmities under which the grantor labored were continous and increasing up to the year 1855, and, in the year 1857, a bill was filed by the grantor to have the deed vacated; HELD :

That there was no such *laches* on the part of the grantor as would prejudice her rights.

APPEAL from the Circuit Court for Washington County, sitting as a Court of Equity :

The bill in this case was filed for the purpose of vacating

a certain deed from the appellee to George Stiffler, the testator of the appellants. The bill states, that in the month of March 1849, and for a long time previous, the appellee owned a house and lot in Sharpsburg, Washington County, and that she resided in another house owned by her, in which also her son, George Stiffler, resided with her.

That owing to her great age (some ninety years) and total inexperience in business, and her inability to read or write, she depended on, and fully entrusted to her said son George, the conduct of all her business, and that she frequently signed papers brought to her for her signature by her son George, without fully comprehending their meaning, but being satisfied with his assurances that it was for her interest and advantage to do so.

The bill then states that John Stiffler, another son of the appellee, being largely indebted unto divers persons, contracted solely on his individual responsibility, her said son George Stiffler informed her that a certain Jacob H. Grove had a judgment against John, and was about to take out execution thereon, and that as John owned no property, Grove would seize upon the property of the appellee in payment thereof, and that at the same time the said George advised and persuaded her to assign to him certain notes, &c., and represented that by this course alone could she save her own property from being taken in execution for the debts of her son John. That confiding in her son George, and thinking it unjust that her property should be taken for the debts of another, she did sign certain papers, &c., by which she imagined she had rescued her property from the perils impending by reason of the debts of her son John.

The bill also states, that afterwards, to wit: in 1855, George Stiffler died, leaving his last will and testament, in which he appointed his two daughters, Mary, wife of Daniel Hill, and Elizabeth, wife of John Highberger, executrices of his will, who subsequently renounced their trust, and John Highberger and Daniel Hill were appointed

administrators *cum testamento anne: o;* that afterwards, on the 5th February 1857, Daniel Hill and John Highberger and others filed their bill in the Circuit Court for Washington County, sitting as a Court of Equity, against the infant children of Mary, wife of Daniel Hill, (but who had died intestate,) for a sale of the real estate of George Stiffler, in which it is stated that George Stiffler died seized and possessed of the property in question, and that this was the first intimation received by the appellee that the said premises were claimed by others, and that until after the death of her son George, she never supposed that any claim adverse to her own had been set up to the premises.

The bill then alleges, that if any such deed was signed or executed by the appellee, it was signed and executed in consequence of the fraudulent misrepresentations of her son George, and through his improper and over-weening influence over her, she being very old, feeble, inexperienced, and unable to read or to write; that she did not receive the moneyed consideration mentioned in the deed, and charges that the deed was not read to her, nor its effect or purport explained to her, but was obtained through fraud, &c., and is not binding. The bill then prays that the said deed be canceled, declared null and void, and for general relief. On the 25th of May 1859, the defendants filed their answer, admitting the death of George Stiffler, his last will as stated in the bill, the appointment therein of his daughters his executrices, their renunciation, and the appointment of Hill and Highberger, as stated in the bill; also the filing of the bill against the heirs of Mary Hill, whom they admit is dead, &c. But they deny all fraud in the obtention of the deed, insisting that it was a fair and *bona fide* transaction. They deny that the appellee was incapable of attending to her own affairs, but suggest that "at the time of filing her bill of complaint in this case, she was induced to do so because of undue and improper influences executed over her by reason of her imbecility, occasioned by advanced old age." And they aver that by her own shew-

ing she should have sued by her committee or next friend, instead of filing the bill in her own name."

A commission was issued, under which the appellee proved as follows:

By *Jeremiah Kuhn*, that he knew the appellee and her son George, (the defendant's testator,) that the appellee lived with her son, that she never came to his store to purchase or settle for any thing; all this was done by George who bought articles for her, and settled for them, as he drew the "interest of her money which was out on interest;" that about the year 1850, George Stiffler (appellant's testator) came to his office (he was then a magistrate) and asked him and John Hill to go to his (George's) house; they went, and there took a list of articles. Witness then asked appellee whether she gave those articles to her son George? to which she replied, "Yes." Hill opposed this. But "George said he wished to save an administration on that property, and that he would make it all right with the other heirs."

As to the deed in question, the same witness Kuhn, says, that the above constituted all the business transactions with the appellee, except the "acknowledgment of a deed before him as magistrate, and the transfer of three or four notes, at the same time the deed was executed." He does not think the appellee was capable of knowing that she was assigning these notes to her own injury, "and he supposed from the condition of her mind that she was influenced to make those transfers by her son George." Afterwards, in 1850 or 1851, George Stiffler was charged with having all the appellee's property in his hands, and this charge he did not deny.

The fifth general interrogatory calls attention particularly to the execution of the deed in question. On that subject the following witnesses testified:

1st. *Jeremiah Kuhn*, that in 1849 George Stiffler sent for witness to come to his house, when he arrived there he found R. E. Cook, (a magistrate,) and George Stiffler;

George brought his mother into the room, "and told her he wanted her to acknowledge that deed which Cook held in his hand, and make her mark, she came forward very feebly and made her mark." She was then about eighty-nine years of age. She acknowledged the deed, and then Cook pulled out three or four notes, one for $350, one for $500, one for $200 or $300, and a fourth, the amount not remembered. "Each of these notes had an assignment written on its back," to which the appellee made her mark. The deed was not read or explained to appellee, nor was any purchase money paid.

2nd. *R. E. Cook*, that George Stiffler told witness that his mother wanted him to come to the house to make transfers, &c. When deponent got there George went to the drawer and got the notes, and witness wrote the assignments on them. There was conversation in German between the mother and son, not understood by the witness. The deed was then produced. Deponent had written the deed at the request of George, and had taken it to the house that morning. The deed was acknowledged after some further conversation in German between mother and son. But deponent has no recollection whether it was read to her or not. No money was paid, nor was any thing said about money.

3rd. *John Hill*, that he went at the request of George Stiffler to his house, he thinks in company with Jeremiah Kuhn, and was present at the execution of an instrument of writing from Sarah Stiffler to George Stiffler. It was the only paper executed by her that deponent ever witnessed.

That the magistrate who drew up the instrument would still ask the old lady questions and "George would answer them." She did not say any thing. No part of the instrument, except the acknowledgment, was read to her. No money was paid, and witness "thought at the time that it was more George's instrument than the old lady's."

There was also proof that George Stiffler represented to his mother that the creditors of her son John were pressing for the payment of the debts due from John, and influenced her to believe that her property was liable, and in peril for John's debts.

The complainant further proved the declarations of George Stiffler, that he did not claim the property as his own, that he was only keeping it for his mother during her lifetime, and at her death it should be fairly and equally divided among her heirs.

There was also evidence that for many years before, and at the time of the execution of the deed, George Stiffler had been entrusted with the management and control of all the appellee's business; and that she was of sound and disposing mind, capable of making a valid deed, &c., and of managing her own business.

The appellant's witness, Rebecca Price, states, that she was well acquainted with Sarah Stiffler for more than twenty years. She told witness frequently, from the year 1849 to a short time previous to the death of George Stiffler, that she had made all her property over to her son George. That he was a kind son to her, and all she possessed was his; and she did not intend that any of her other children should have any of her property. That George took care of her, attended to all her business for her, and maintained her; and those were the reasons for which she gave her property to him. That George Stiffler exercised ownership over the property, had a stable built upon it, repaired it, and that some three or four months before his death, when a mechanic presented a bill to her for repairs, she sent him to George Stiffler for payment, assigning as a reason, that the property belonged to him.

*Mary Martin* stated that she knew Sarah Stiffler for more than twenty years. For a long time before George Stiffler's death, up to a year prior thereto, she told witness every thing she had she gave to her son George, because he was

kind to her in sickness and in health, attended to her business for her, &c.

*Mary Marker* stated that, in the year 1852 or 1853, Sarah Stiffler told her that her son George was the only child she had who cared for her, and she intended him to have all her property. That he did every thing for her, and took care of her, &c.

And *Jacob Highberger*, that George Stiffler always spoke of the property as his own. He employed witness to build a stable on it, and paid him for it. That Sarah Stiffler lived with her son George eight or nine years.

The Court below, (PERRY J.,) passed a decree setting aside the deed, from which decree the defendants took this appeal.

The cause was argued before BOWIE, C. J., and GOLDS-BOROUGH, and COCHRAN, J.

*Z. S. Claggett*, for the appellants:

A case of misrepresentation and fraud, necessary to sustain this bill, has not been made out. Old age alone is not sufficient ground to presume imposition. See *Van Alst vs. Hunter*, 5 *Johns. Ch. Rep.*, 158. *Jennings vs. Pendergrast*, 10 *Md. Rep.*, 346. *Ellis vs. Smith*, 1 *Vesey, Jr.*, 19. *Mooddy vs. Reid*, 1 *Madd. Ch.*, 280. She must be imposed upon by deceit, against which ordinary prudence would not protect her. 1 *Story's Eq.*, secs. 199, 202, 236, 237.

The appellant's title to this property is derived from the deed of the appellee to George Stiffler, solemnly executed according to law, on the 7th day of April 1849; and at the time she executed the same, the witnesses for both sides testify she was of sound and disposing mind, and capable of making a valid deed or contract. Where capacity to make a deed is established, the grantor is presumed to have knowledge of its contents. See *Cramer vs. Crumbaugh*, 3 *Md. Rep.*, 491, 503.

'That this deed was executed with full knowledge of its contents, and was a fair and *bona fide* transaction, is shown:

1st. By the admissions of Sarah Stiffler, frequently made by her from the date of its execution to the time of the death of George Stiffler in 1855, that she had conveyed all her property to her son 'George; and from the well established fact that he took possession of the house and lot conveyed to him, improved it by building upon it, and repaired it—she refusing to pay the mechanics for repairs, because it was the property of her son George.

2d. Its validity is further confirmed from the fact that she acquiesced in the deed for the space of nearly nine years, before she attempted to assert her alleged title, viz: from the 7th April 1849, to the time of filing her bill on the 27th day of October 1857. Equity always discountenances *laches*, and will refuse relief where the party has acquiesced for a great length of time. See *Hamilton vs. Beall*, 2 *H. & J.*, 414. 2 *Story's Eq.*, sec. 1520 and note 3.

3rd. The appellee proves by her own witness the validity of this deed. See evidence of Paul Hammond, John Hill, and others.: "That it was George Stiffler's property, and he could do what he pleased with it."

The appellee attempts to show that George Stiffler was to hold the property during her life, (for which he was to maintain her,) to prevent Grove and other creditors of her son, John Stiffler, from making their claims out of her estate after her death. This proof is inconsistent with the allegations of the bill. If this was true, (of which there is no sufficient evidence,) she should have stated in her bill the real agreement, and that the deed imports a contract different from that entered into. See *Wesley vs. Thomas*, 6 *H. & J.*, 24. If this was the consideration of the deed, the decree must be reversed, because it declares the deed null and void to all intents and purposes.

It is said that parol evidence is not admissible to set up a consideration different from that stated in the deed. To this we answer: 1st. The evidence tends to prove the same

kind of consideration. 2nd. It is admissible to show the *bona fides* of the transaction and to disprove fraud. See *Harris & Chauncey vs. Alcock*, 10 *G. & J.*, 248. *Baxter & Wife vs. Sewell*, 3 *Md. Rep.*, 334. *Cole vs. Albers & Runge*, 1 *Gill*, 423. 2 *Hilliard on Real Property*, 275, 276 and 278. And 3rd, its admissibility was not objected to; no exceptions were filed by the complainant to any testimony of the defendants.

Exceptions were filed by the appellants to the testimony of all the witnesses examined by the appellee. Van S. Brashears and Wm. Brashears testify to facts which make them interested witnesses, and their testimony should be excluded. Kuhn and Cook the magistrates who took the acknowledgment of the deed in controversy, are not competent witnesses to contradict or impeach their certificate of the acknowledgment. *Central Bank of Frederick vs. Copeland*, 18 *Md. Rep.*, 305 and 318.

The testimony of those witnesses who speak of the influence George Stiffler exercised over his mother is inadmissible, because it is mere naked, unsupported opinion, and no sufficient foundation was laid for the opinion of the witnesses. *Stewart vs. Redditt*, 3 *Md. Rep.*, 67. *Brook vs. Townsend*, 7 *Gill*, 10. *Shelford on Lunacy*, 279. *Hathorn vs. King*, 8 *Mass.*, 371. Tried by the proper test, all the testimony of the appellee on this point is inadmissible.

*A. K. Syester,* for the appellee:

The appellee will maintain that this deed was obtained by fraud and imposition, practiced upon her by the appellant's testator.

Fraud is not susceptible of direct proof, it is an inference derived from facts and circumstances, no one of which, standing alone, would be sufficient for the purpose, but all pointing to the same conclusion, and combining to produce the conviction of fraud.

These facts and circumstances are as various as the in-

dividual cases, but in this case they are believed to be strong and convincing beyond precedent.

The grantor was very far advanced in years, had been subject to repeated and prostrating attacks of illness; for years had given no attention whatever to her business, had surrendered all the cares and interests of life, even the most ordinary and trivial, to the grantee; she was living with the grantee wholly under his direction and guardianship; the relation of the grantee gave him a commanding influence over the grantor; he was her agent; he imposed upon her the belief that her property was in peril, to answer the debts of a third person, and under the influence of fear and alarm for the safety of her property, she signed this deed; the deed was prepared at the instance of the grantee; he obtruded it upon the grantor, and imposed a false statement on her feeble understanding which influenced her to sign the same; she was unable to read or write, and the deed was never read to her; at the same time she conveyed or transferred all her remaining property to him, thus leaving herself entirely destitute, and wholly dependent on the grantee to be fed, clothed and lodged at his pleasure. 1 *Bland*, 391, and the cases there cited.

Again, the parties occupied the relation of principal and agent; the testator of the appellants had controlled and managed all the appellee's business for years, she had entire confidence in him, he had the most commanding influence over her; Courts will scrutinise with severe and exacting jealousy transactions between parties holding such relations. And although dealings between them may not be *ipso facto* void, still, the burthen of establishing the fairness of the transaction, is thrown on the parties claiming under this deed. 1 *Story's Eq. Jur.*, sec. 311, 315, and note 332. And this principle is applicable to every variety of relation where dominion and control may be acquired by one over another. *Dent vs. Bennett,* 5 *Myl. & Cr.*, 277. *Huguenin vs. Basely,* 14 *Ves.*, 273.

2nd. The question here is, not whether the grantor was competent to make a deed, contract, &c.; not whether she knew what she was doing or proposed to do, but how the intention to make this deed was produced; for this, altho' on its face it purports to be for a valuable consideration, is nevertheless shown to be a pure gift. *Huguenin vs. Basely,* 14 *Ves.*, 273.

3rd. Old age of itself is not a matter to support a presumption of susceptibility to fraudulent imposition, but taken with the facts appearing in this case, it is. *Hatch vs. Hatch*, 9 *Ves.*, 296. *Griffith vs. Robbins*, 3 *Madd. Ch. Rep.*, 105. *Brogden vs. Walker*, 4 *H. & J.*, 285.

Bowie, C. J., delivered the opinion of this Court :

This is an application to a Court of Equity by a grantor, against the heirs and representatives of her grantee, to vacate a deed upon the ground of actual and constructive fraud. The bill alleges that, the appellee being a woman of extreme age, unable to read or write, and depending on her son, George Stiffler, for advice, assistance and direction in all matters of business, in which he was and had been for many years her exclusive agent, in the month of March or April 1849, was induced by fraudulent devices and pretences practiced by him, to convey to her son, in fee, a certain house and lot in Washington County, for the nominal consideration of six hundred and fifty dollars, whereas, in fact, no consideration was paid; which conveyance was not known to the complainant until after the death of George Stiffler, when certain proceedings were instituted to make partition of his real estate among his heirs at law, through which the complainant was first informed of the fraud and imposition practised upon her. All the material allegations of the bill (except the extreme age of the complainant) are put in issue by the answers. Testimony was taken by each party under the commissions issued in the cause. The defendants have filed exceptions to the interrogatories of the complain-

ant, on the ground that they are leading. To the testimony of the witnesses Brashears, because they are interested in the cause. To so much of the testimony of Kuhn, Brashears, Hammond and Hill, as professes to prove the condition of the complainant's mind and the influence exerted on her by George Stiffler, because they give opinions without stating the facts on which those opinions are founded; and the other facts to which they testify are irrelevant and inadmissible. But one of the interrogatories in the series of the complainant's interrogatories-in-chief, seems to us objectionable as leading, viz: the fourth, but the view which we take of the facts proved under other interrogatories, renders the objection unimportant on the general bearing of the case.

The testimony of Cook is excepted to as irrelevant, and inadmissible for other reasons. Exceptions are taken to the declarations of the complainant, as to the property belonging to her, and to the admissibility of Exhibit S.G. for the purpose for which it was offered, "there being no exhibit with the bill of complaint of a certified copy of the deed." It is unnecessary to notice all these specifically, those operating upon the evidence deemed material will be commented on. The Messrs. Brashears being shown to be grand-children of the complainant, it is contended, that their testimony tending to set aside the deed for incapacity in the grantor, establishes facts which make them interested in the result of the cause. This objection goes to their credibility, rather than their competency. Their interest is contingent, not certain. "To render the person called incompetent as a witness, he must have a legal interest, a direct and certain interest in the event of the suit, inclining him against the party objecting." 1 *Phil. on Ev.*, sec. 6. *Reynolds, Adm'r of Paul, vs. Manning,* et al., 15 *Md. Rep.*, 510.

Messrs. Kuhn and Cook were both subscribing witnesses to the deed sought to be vacated, and the justices of the

peace before whom it purports to have been executed and acknowledged. It is certainly against the policy of the law, that justices of the peace should be permitted to contradict, as witnesses, what they are officially certified to as magistrates; to that extent they are incompetent as witnesses. *Vide* 18 *Md. Rep.*, 318. Beyond this, there is no rule of law which precludes them from testifying to facts which do not contradict their official certificates, although those facts may incidently operate on the legal effect of the instrument acknowledged before them. For instance, they may testify to the age and health of the grantor, to the payment or non-payment of the consideration money, the reading or omission to read the instrument, or other collateral facts not conflicting with what they had certified.

The rules of evidence which incapacitated attesting witnesses from impeaching instruments to which their signatures had given credit, have been relaxed and abandoned. 1 *Phil. Ev. (Cow. Phil. & Hill,) secs.* 128, 129. *Townshend vs. Townshend*, 9 *Gill*, 506. Such evidence however is to be received with much jealousy. Neither Kuhn or Cook testifies to any fact contradicting their certificate. Most of the testimony of the former relates to facts independent of, and having no connection in time or place with the execution of the deed. Their answers to the fifth general interrogatory refer to its execution, and detail the circumstances attending. From these it appears, the grantor was about eighty-nine years of age, that her son George brought her into the room and told her he wanted her to acknowledge the deed which Cook held in his hand, and make her mark; that she came forward very feebly and made her mark and acknowledged the deed, and at the same time Cook pulled out three or four notes (amounting in the aggregate to $1000.) "Each of these had an assignment written on its back," to which the appellee made her mark. The deed was not read or explained to the appellee, nor was any purchase

money paid. The deed was written at the request of George. Another witness (Hill) says, he was present at the execution of the instrument of writing from Sarah Stiffler to George. That the magistrate who drew the instrument would ask the old lady questions, and George would answer them. She did not say anything. No part of the instrument, except the acknowledgment, was read to her. No money was paid, and witness thought at the time that it was more George's instrument than the old lady's.

Paul Hammond testifies, that George Stiffler told him he advised his mother to make her property over in order to relieve herself from difficulty. The idea was, that Jacob Grove had a judgment against her son, John Stiffler, which he expected to make out of John's interest in her property, and George told him, *in consequence of these representations,* he held the property.

It is unnecessary to cite further the testimony on the part of the complainant. On behalf of the defendants it was proved, that the appellee frequently between 1849 and 1855, said she had made all her property over to her son George; that he was kind to her, and all she possessed was his; that she did not intend any of her other children should have any of her property; that George took care of her, attended to her business for her, and maintained her, and those were the reasons she gave her property to him. These witnesses all think the grantor was of sound and disposing mind, and capable of making a valid deed or contract. Wherever a fiduciary relation exists, legal or actual, whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of Equity, independent of the ingredients of positive fraud, through public policy as a protection against overweening confidence, will interpose to prevent a man from stripping himself of his property. *Story's Equity,* secs. 303 to 322.

The relation requires the parties to abstain from all selfish projects. "The general principle is, if a confidence is

reposed, and that confidence is abused, Courts of Equity will grant relief." One of the most familiar examples is that of parent and child: "All contracts and conveyances whereby benefits are secured by children to their parents, are objects of jealousy, and if they are not entered into with scrupulous good faith, and are not reasonable under the circumstances, they will be set aside, unless third persons have acquired an interest under them, especially where the original purposes for which they have been obtained are perverted or used as a cover." *Sec.* 310, and authorities cited in note 2. "The same principles are applied to persons standing in a situation as *quasi* guardians, or confidential advisers." *Revell vs. Harvey*, 1 *Sim. & Stu.*, 502. These principles are fully adopted and endorsed by this Court in the case of *Burke, et al., vs. Berry*, 2 *Gill*, 99.

The natural relation of the parties was reversed in this instance by the influence of time. The parent had become a child, and the child was guardian to the parent. The same dependence, overweening confidence, and implicit acquiescence, which rendered one an automaton in the hands of the other, existed, "*et ubi eadem ratio, ibi idem jus.*" The wish of the agent had become the will of the principal. Whatever the former suggested, the latter executed. There was no consent of two minds, but a *merger* of the principal's mind into the agent's.

In such cases it is not necessary to prove the actual exercise of overweening influence, misrepresentation, importunity or fraud *aliunde* the act complained of. Justice Story says: "On the one hand it is not necessary to establish that there has been fraud or imposition on the client, and on the other, it is not necessarily void *ipso facto*. But the burthen of establishing its perfect fairness, adequacy and equity, is thrown upon the attorney, upon the general rule that he who bargains in a matter of advantage with a person placing a confidence in him, is bound to show that a reasonable use has been made of that confidence,— *a rule*

45	v. 21

*applying equally to all persons standing in confidential relations with each other."* Story's Equity, sec. 312, and authorities in note 1. If no such proof is established, Courts of Equity treat the case as one of constructive fraud. *Ibid.* In this respect there is said to be a distinction between the case of attorney and client, and that of *trustee and cestui que trust;* that in the former, if the attorney, retaining his connexion, contracts with his client, he is subject to the *onus* of proving that no advantage has been taken of the situation of the latter. But in the case of a trustee, it is not sufficient to shew that no advantage has been taken; but the *cestui que trust* may set aside the transaction at his option." *Ibid.*

Among the circumstances indicative of actual fraud, which constitutes a ground for vacating a deed, Chancellor Bland, in *Colegate D. Owings's case,* enumerates: "Such as that a deed never having been left for perusal, or its not being read, or its being prepared by the grantee and obtruded on the grantor, or where the gift was exorbitant, or where the party had not then the means of paying what he stipulated to pay, or where in consequence of the relation in which the parties stood towards each other, or in any way the grantee had obtained a commanding influence, or the entire confidence of the grantor, which was used. * * * * Where the weak man had conveyed all his property, leaving himself to be fed and clothed at the pleasure of the grantee." In all these, and many other similar cases, the weakness of mind of the party, who was not altogether *non compos mentis,* has been taken into account with the other circumstances, to make up that amount of imposition and fraud which was considered a sufficient ground for relief. 1 *Bland,* 392. It will be seen, upon comparison of the testimony with the text just cited, that many of the *indicia* of fraud mentioned, occur in this case. Whatever view we take of the evidence, whether the relation between the grantor and grantee was that of principal and agent, trustee and *cestui que trust,* or *quasi* guardian

and ward, the confidence reposed, and the influence acquired, were such as to compel a Court of Equity to declare a deed executed in the manner and under the circumstances proved, improvident and voidable at the instance and option of the grantor. As the influence and infirmities under which the grantor labored were continuous and increasing up to the year 1855, the period of the death of the grantee, but two years elapsed between that and the filing of the bill, an interval too brief to imply such *laches* as would prejudice her rights. There is no evidence of any confirmation sufficient to ratify the deed in question.

The decree appealed from will be affirmed, with costs to the appellee.

*Decree affirmed.*

(Decided May 11th, 1864.)