STEPHEN W. DUNCOMBE, ADM'R v. JAMES S. RICHARDS ET UX.

*Death-bed assignments—Fair dealing—Gifts—Acknowledgments.*

Successive transfers of property consisting of mortgages were procured by a nephew from his uncle within a few days before the latter's death and while he was in an enfeebled condition. The uncle was 82 years old, had made his home with his nephew and was said to be estranged from his other near relations. He was a temperate and thrifty bachelor who had little society. The nephew was neither temperate nor thrifty. *Held* that as the assignments were made on the donor's death-bed, and in the absence of all near relations except the beneficiary, they were open to suspicion, and on a bill to set them aside the beneficiary had the burden of showing their fairness.

Where one who has the burden of showing fair dealing is evasive in his testimony he increases the burden and it is no excuse that he was afraid of being entrapped by counsel.

The question in determining whether a gift has been made is not what the donor had contemplated or intended, but whether his intentions were carried into effect; and to accomplish this an intelligent will directing or assenting to the act done, is essential. .

On a bill to set aside transfers of mortgages made on the grantor's death-bed and claimed by the transferee to have been made as a gift, testimony that the donor, though shown to be a prudent and sensible man, had confidentially disclosed to inferiors and strangers what he intended to do with his property, can give little support to a suspicious case; nor can testimony that he had once handed over to the transferee a box of mortgages, saying "I give you all my personal property,"—there being no reason to suppose that he afterwards considered himself divested of the property or that the supposed donee considered himself owner; nor can testimony that after the transfers were made the donor was heard to say that the donee should have his property when he was done with it.

Where an acknowledging officer, when summoned to attest the transfer of property procured by the transferee under suspicious circumstances, neglects to carefully investigate the condition of things in the beneficiary's absence, his testimony that the donor seemed to be in full possession of his faculties is less satisfactory than if he had taken such precautions.

Appeal from Van Buren. Submitted April 13-14. Decided June 8.

BILL to set aside assignments of mortgages. Defendant appeals. Affirmed.

*B. F. Heckert, Spafford Tryon* and *Joslyn & Freeman* for complainant. Contracts, gifts and beneficial transfers to a confidential agent are open to suspicion: *Comstock v. Comstock* 57 Barb. 469; *Delafield v. Parish* 25 N. Y. 9; *Sears v. Shafer* 1 Barb. 409: 6 N. Y. 272; *Whelan v. Whelan* 3 Cow. 537; *Eadie v. Slimmon* 26 N. Y. 9; *Rollwagen v. Rollwagen* 63 N. Y. 508; Story's Eq. Jur. §§ 176, 178; and the grantee has the burden of showing good faith: *Todd v. Grove* 33 Md. 188; *Boyd v. De La Montagnie* 73 N. Y. 502; *Hoghton v. Hoghton* 15 Beav. 278; *Lake v. Ranney* 33 Barb. 69; *Forman v. Smith* 7 Lans. 450; *Bergen v. Udall* 31 Barb. 24.

*F. J. Atwell* and *C. I. Walker* for defendant.

COOLEY, J.   At the beginning of the year 1878 Hezekiah Selleck, a man 82 years of age, was living in the family of James S. Richards the defendant, in Van Buren county in this State.   Mr. Selleck was a man of some education, was prudent even to excess in his expenditures, strictly temperate, and had accumulated a very considerable property.   He had never married; a fact which is attributed by some witnesses to a disappointment in his mature manhood, and which probably tended to make him somewhat shy, and to prefer the retirement of a plain country life which he found with defendant.   Defendant was his nephew; was not abstemious as his uncle was; had not been a money-making man, and what he possessed was largely due to his uncle's assistance and gifts.   Mr. Selleck had a brother and nephew living in Vermont, and two nieces, one of whom was a sister of defendant, and had been at one time housekeeper for her uncle before he went to live with defendant.   There is evidence tending to show that Mr. Selleck was estranged from this last-mentioned niece; and those who attempt to account for the fact attribute it to her being married against his will, though her husband, so far as appears, is a person to whom no good objection could be urged.   There is also evidence that he expressed feeling against his brother, by whom he said he had lost money; not a large amount, however, and less than he had lost by defendant.   Whether or not he was really estranged from his other relatives as is supposed, it is quite sure that at the time mentioned he was living on confidential relations with the defendant, having very little society, and no society at all of his other relatives except occasional visits from defendant's sister.   Nothing in the evidence indicates that his mind was not clear, or that it was enfeebled otherwise than by the inevitable infirmities that come with great age.

About this time, however, he became seriously ill with inflammation of the stomach, and early in March was considered in a dangerous condition.   On the 18th of that month

the attending physician pronounced his case hopeless, and said he was dying of the poison of uric acid. He nevertheless revived after that day, and lived until the 15th day of the next month. The series of events which have given occasion for this suit took place in the month in which he died. On the third day of that month defendant procured from Mr. Selleck an assignment of a mortgage given by one Koshway to secure the payment of $240. On the eighth he obtained an assignment of a mortgage given by one Hedges for $4800. On the tenth a mortgage for $1275 given by one Daniel Brosnahan was assigned to him, and also another for $2478.55 given by Thomas, Michael and Timothy Brosnahan. On the same day the three Brosnahans gave to defendant a purchase-money mortgage for $6000 on land conveyed to them by Selleck. On the day Selleck died defendant obtained from him two assignments; one of a mortgage for $430 given by one Downey, and another of a mortgage for $2670.32 given by one O'Keefe. These mortgages constituted nearly all of Mr. Selleck's property so far as it was within the knowledge or observation of his acquaintances, and left belonging to him at his death insufficient means for the payment of his debts.

These assignments being made by Mr. Selleck while on his death-bed, in the absence of all his near relatives except the beneficiary himself, were naturally the subject of grave suspicion, and the circumstances justly, as we think, imposed upon the defendant the burden of making some showing of their fairness. *Dent v. Bennett* 4 My. & Cr. 269; *Billage v. Southee* 9 Hare 534; *Tate v. Williamson* L. R. 2 Ch. App. 56; *Turner v. Collins* L. R. 7 Ch. App. 329; *Ashwell v. Lomi* L. R. 2 P. & D. 477; *Seeley v. Price* 14 Mich. 541; *Wartemberg v. Spiegel* 31 Mich. 400; *Jacox v. Jacox* 40 Mich. 473; *Ferguson v. Lowery* 54 Ala. 510; *Highberger v. Stiffler* 21 Md. 338; *Pierce v. Pierce* 71 N. Y. 154; *Cowee v. Cornell* 75 N. Y. 91; *Cadwallader v. West* 48 Mo. 483. This he soon had an opportunity of making in the probate court. Mr. Duncombe was appointed administrator on Mr. Selleck's estate, and caused the defendant to be sum-

moned into court to answer to a charge of secreting assets.

It is not now pretended that defendant could stand for a moment on the testimony he then gave. It is evasive and contradictory, and it makes a pretence of having purchased the mortgages, or taken them as security, which is now wholly abandoned. His course on this examination is now excused on the suggestion that he was afraid of being entrapped by counsel, and sought to protect himself by evasions. If the excuse is well founded it is plain that defendant by his baseless pretences under oath increased the burden already resting upon him of making a showing of fair dealing by other evidence.

The administrator filed his bill in equity to reclaim all these mortgages for the estate, charging that they were obtained from the intestate when he was incapable of intelligently transacting business, and by means of fraud and undue influence. The defendant answered, claiming the mortgages as gifts, made by the intestate when he was perfectly capable of understanding what he was about, and in pursuance of a long-cherished design.

Of the long-cherished design there is some evidence. Some of it, however, looks like an arrangement of appearances for some other purpose than a transfer of property. Of this character is the evidence of defendant's wife that in the winter of 1875-6 Mr. Selleck one morning after finishing breakfast got up from the table, went to a tin box in which he kept his notes and mortgages, took the box and handed it to her husband, saying "Here, James, I give you all my personal property." There is a suggestion which some other facts render plausible, that this was done to enable Mr. Selleck to evade taxation on his securities; but however this may be, there is no reason to think that from this time on Mr. Selleck considered himself divested of all personal estate or that defendant supposed he was owner. Some of the evidence is also extremely improbable, and if true shows him to have had a weakness of mind quite inconsistent with the major part of defendant's testimony. Thus, one woman with whom he had had no intimacy whatever,

and who never saw him but four times, testified to having asked him on the second or third occasion what he was going to do with his property, and according to her statement instead of rebuking the impertinent interference, he confidingly intrusted to her all his intentions. A hired man testifies to similar confidences, one of which was while Mr. Selleck was on his death-bed. He is then said to have told defendant's wife in presence of the witness, that her husband should have his property when he was done with it, though this, as near as we can gather from the uncertain and confused testimony, must have been after Mr. Selleck had already passed over nearly everything. Such evidence can give little support to a doubtful or suspicious case.

The vital question, however, is not what the intestate had contemplated or intended, but whether his intentions were carried into effect. To accomplish this an intelligent will directing or assenting to the act done was essential. To show such a will the magistrate who drew and took the acknowledgment of the papers was sworn. His evidence shows clearly that defendant was the principal actor in procuring the assignments to be made, but it also shows that the magistrate believed the intestate knew at the time what he was doing. But if the magistrate suspected no wrong— and apparently this was the fact—he might easily have supposed he saw evidences of intelligence which were only apparent, not real. It is surprising that it did not occur to him as strange that he was being sent for from day to day to make successive transfers of property for a dying man, and that he was not led by the circumstances to make careful investigation into the real state of the case when defendant was not present. This precaution, however, was wholly neglected, and the magistrate's testimony is for that reason not as satisfactory as it would otherwise have been. That he took things for granted is evident from the written memorandum which he afterwards made of the facts, in which he says that the testator " apparently had been reading, as a newspaper lay on the bed beside him." On the whole we can only say of the evidence it tends to show that Selleck

knew what he was doing when the assignments were made, but there is quite as much that opposes the proposition as that favors it; and there is evidence, even in the testimony of defendant's witnesses which raises serious doubts of Mr. Selleck having been a conscious actor on some occasions. This may be said of Mrs. Keith's evidence of what she observed on the third of April, on which occasion she was told by defendant's wife that they wanted nobody to disturb Mr. Selleck at all, because they wanted to save his strength so that he could sign some papers. And the case is not without circumstances which suggest that actual deception was practiced when the old man was too feeble to detect it.

The suspicious character of the transaction is not relieved by any facts occurring afterwards. Defendant did not inform the Vermont relatives of his uncle's death, and was angry when he found, a month or so afterwards, that his sister had written to them. It is possible he speaks the truth when he says Mr. Selleck did not want him to let them know, because of the feeling he had against his brother; but as Mr. Selleck is shown by the defence to have been a devout Christian, and his last days are represented as having been passed in Scripture reading and contemplation, this statement cannot be readily accepted, and if actually made is no excuse for defendant's neglect.

But it is not important to enter now upon any analysis of the evidence, or any full presentation of the reasons which bring us to the conclusion that the defendant has not made out his defence. The record is exceedingly voluminous, and the evidence has been very carefully sifted and ably presented on both sides, and our unhesitating conclusion is that the decree of the chancery court is substantially correct. In some unimportant particulars it have been differently expressed, but in all essentials it is right as it stands. It will therefore be affirmed with costs.

MARSTON, C. J. and GRAVES J. concurred.

CAMPBELL, J.   I concur, chiefly on the ground that defendant in the probate court gave a different statement from that relied on in this case, and which was palpably false.