(Hamilton County Court of Common Pleas.)

### EVELINE G. KECK et al. v. AMANDA G. SAYRE et al.

---

1. The rule applicable to transactions between persons standing in a confidential relationship to each other, stands on a general principle, applying to all the variety of relations by which dominion may be exercised by one person over another.
2. Undue influence is not to be presumed from the mere relationship of the parties; it may be shown by direct proof, or may be presumed from circumstances.

3. Where a relationship exists from which an undue influence is presumed, the burden is on the recipient to show that the transaction is just and fair; that it is fair in itself, and in its nature and effect fully understood.
4. The recipient may show that the donor had *independent advice*, or *adopted the transactions after the influence was removed* or *some equivalent circumstances*, and thereby overcome the presumptions.
5. The question is not whether the donor knew what he was doing, had done or proposed to do, but how the intention of the donor was produced.
6. A man in old age and sick from paralysis, made large presents to the niece of his deceased wife; the niece was his nurse, and confidential or fiduciary relations existed between them; no independent advice was afforded him, and there was no ratification after the relationship ceased to exist. It appearing that the man and his wife, having no children, had taken the niece when a child into their family, brought her up and educated her as a daughter; that after the death of the wife the niece became his nurse and companion in his old age and sickness; that his mind was clear, and that he fully understood the nature and effect of his acts; that his intention to make the gifts was the result of her devotion to him; that the gifts were justly and fairly made; held such facts were "equivalent circumstances," and that the gifts were valid.

(Decided January Term, 1894.)

### SAYLER, J.

Milton Glenn was born in August, 1812. On arriving at manhood, he married, but he and his wife had no children. He accumulated in his business a small fortune of some $50,000 or $60,000, and then retired from business.

Two nieces of Mrs. Amanda Glenn, wife of Milton Glenn, were taken when quite young, into Mr. Glenn's family, and brought up and educated as members of the family, and married from Mr. Glenn's home. One of these girls married a Mr. Lytle, and the other a Mr. Stewart.

Mrs. Lytle had three daughters, the oldest being born on the day of — of ——, 1865, that day being the 47th birthday of Mrs. Glenn. Mrs. Glenn was present at the birth of the child, and the child was, on its birthday, named Amanda Glenn, after Mrs. Amanda Glenn.

This child became a favorite of Mr. and Mrs. Glenn; in her childhood she spent much of her time at their home. They wished to adopt her, but her father would not consent. When she reached the age of about 14, with the approval of her mother and the reluctant consent of her father, she left her home and went to the home of Mr. and Mrs. Glenn, and became a member of the family. From that time she was treated by them as a daughter; maintained and educated at their expense.

In February, 1887, with the consent and approval of Mr. and Mrs. Glenn, she married the defendant, Lancing Sayre; her wedding took place at the home of Mr. and Mrs. Glenn; they furnishing her with a wedding outfit as a daughter; and thereupon she went with her husband to Utica, New York, where he was engaged in business.

During the year following her wedding, Mr. and Mrs. Glenn wrote letters to her, indicating a parental interest in her.

On March 9 Mrs. Glenn wrote in regard to some diamonds she was having reset for her.

On July 4 Mr. Glenn wrote, sending a check for $100 to assist in paying the expense of a vacation trip which Mrs. Sayre and her husband were proposing to take.

On July 9 Mr. Glenn wrote about the check sent to assist in taking the trip and saying if they needed more he would send it.

On October 6 Mr. Glenn wrote, asking her to come to make them a visit and sending a check for $50 to pay the expense.

On January 30, 1888, Mr. Glenn wrote a letter addressed to Lancing and Amanda, and enclosing a draft for $5,000 to be used by Mr. Sayre in his business

This money was invested by Mr. Sayre in his business temporarily, and was then paid by him over to Mrs. Sayre in installments. Upon the receipt of the first installment Mrs. Sayre offered the same to Mr. Glenn, but Mr. Glenn told her to keep the money for herself, and she thereupon invested the greater part of this $5,000 in stocks in her own name.

And in February, 1888, he wrote in reference to a gift for her birthday.

In the Spring of 1887, at the request of Mr. and Mrs. Glenn, she came to Cincinnati and visited them for five or six weeks, and again in the Fall, she visited them in response to the letter of October 6, sending the money to pay the expense, and spent Thanksgiving with them, and remained some weeks.

I think Mrs. Glenn was disappointed in the progress Amanda Lytle had made in her education, and so expresed herself; and further that she thought that, now that she was married, she should remain more at home with her husband and so expressed herself; and that it worried her to have Mrs. Sayre so long at their home on the visits. But there is nothing in the case indicating that she had in any way lost her affection for Amanda; the letters show great affection; she had made Amanda her residuary legatee some years before, and had notified Amanda of the fact in a very affectionate letter written from abroad; and there is nothing tending to show that she had repented of her act, or thought of changing her will.

I think the testimony shows that during this absence, Mr. Glenn longed for her presence, and thought of her and of her comfort, as he would of a daughter.

In the year 1868, Milton Glenn made a will bequeathing his property to his brother's children and to charities.

In 1872 he made a will by which he bequeathed all his property to his wife.

In 1884 Mrs. Amanda Glenn made a will by which she made some bequests to relatives, and then bequeathed all the remainder of her property to Amanda Lytle. By this will practically all her property was given to Amanda. Mr. Glenn witnessed this will; so it was made with his knowledge and sanction.

In the month of September, 1888, and prior to the death of his wife, Mr. Glenn made a new will (revoking the will of 1872) and by the provisions of which, he made a division of his estate among the relatives of himself and of Mrs. Glenn, and by which he bequeathed the sum of $15,000 to Mrs. Amanda Sayre.

This will of 1888 is relied upon by the plaintiffs in this case, and I therefore take it as conceded that at this time Mr. Glenn was of sound mind and memory, and not under any restraint in the execution of the same.

Prior to 1880, Mr. Glenn suffered from a slight attack of hemiplegia. He seemed to recuperate from this. In 1880 he suffered from another attack, which was so severe as to render him unconscious for some days, and to paralyze one side of his body; confining him to his bed for several weeks. He gradually recuperated from this attack; he recovered the use of his entire body, but probably not his entire strength, as his feet seemed to drag a little, and within a few years afterwards, he lost the strength of his legs, and he was compelled to use one and sometimes two canes with which to walk. There were no outward indications that his brain had been permanently affected.

After he was sufficiently recuperated, he did considerable traveling.

In the year 1888 Mr. Glenn's physical condition was such, that although he did not require nursing, yet he did require some attention. His

wife was growing old, and became tired out and desired to go to Chautauqua for some weeks' recreation.

Relatives of Mr. Glenn and of Mrs. Glenn were living in Cincinnati, and would willingly have given him all needed attention; but Mr. Glenn seemed naturally to turn to Mrs. Sayre and sent for her; sending her money to come: and she came in response to his request, and Mrs. Glenn left on her trip.

Mrs. Glenn returned home after an absence of some weeks, and within a day or so was taken sick, and Mrs. Sayre remained for the purpose of nursing her.

During the absence of Mrs. Glenn, and on her return, after she was taken sick, Mrs. Sayre had charge of all the affairs of the household. She nursed Mrs. Glenn during her sickness, and had full charge of the sick room.

Either on her own volition, or under instruction from the doctor, she refused admission of persons to the sick room. The testimony tends to show that for some days prior to the death of Mrs. Glenn, the doctor had given instructions that no one was to be admitted to her room, and these instructions were enforced against the relations of Mr. and Mrs. Glenn. Either on the day of the death of Mrs. Glenn, or the day previous, Mrs. Sayre, under such instructions, refused to allow a sister of Mrs. Glenn to see her, and had prior to that time refused to allow a niece of Mrs. Glenn to see her. Some, at least one, of the relations, offered to assist in nursing Mrs. Glenn; but her offer was declined; and upon the death of Mrs. Glenn she was prepared for her burial by Mrs. Sayre, assisted by the nurse; and the relations were not allowed to see her until she was placed in the coffin.

The testimony tends to show, that some years before, Mrs. Glenn had expressed a wish, that on her death, her sister should dress her in a shroud similar to the shroud upon a body then being viewed by her and her sister. This sister expressed the desire to Mrs. Sayre to make the shroud for Mrs. Glenn in the event of her death; this offer was declined by Mrs. Sayre.

From the circumstances in the case, I think I may safely assume that Mr. Genn had full knowledge of the manner in which Mrs. Sayre managed the affairs of the household, prior and during the sickness of his wife, and of the manner in which she took charge of, and nursed, his wife, during a sickness of some weeks, and of her deportment to the relations of his wife and of himself during such sickness.

He was then in good mind; of sufficient physical strength to be in and out of the house, and on the street unattended; he had ample opportunity to observe all that was going on; the relations felt that they had not been treated kindly by Mrs. Sayre, and anything not observed by Mr. Glenn, he undoubtedly learned from the relations.

By the death of his wife the household of Mr. Glenn was broken up; Mrs. Sayre having her residence in Utica. He was old and wished companionship. His physical condition was such that he required attention. He had ample means to maintain himself and such companion or companions as he might choose, during the remainder of his life.

The relations of himself and of his wife were all kindly disposed towards him, and he could choose among them; one of his wife's nieces offered him a home, and one of his own nieces asked him to make his home with them, and one of his wife's nieces offered to take care of him. With full knowledge of his surroundings as aforesaid, Mr. Glenn choose Mrs. Sayre as the one out of the many who should come to him to take charge of his household, and be his companion for the remainder of his life, and .

he asked her if she would stay and take care of him. And it was thereupon arranged that she should stay, and that her husband should give up his business in Utica, and come to Cincinnati to live with them; and during the first part of the following year Mr. Sayre came to Cincinnati.

Thus the household was formed of Mr. Glenn and Mr. and Mrs. Sayre; Mrs. Sayre having full charge and control; but all expenses of the same, including the expenses of Mr. Sayre, were borne by Mr. Glenn, possibly assisted to a very limited extent by Mrs. Sayre out of moneys theretofore given her by Mr. Glenn; practically Mr. Glenn bore all the expense.

The testimony tends to show that Mr. Sayre obtained employment in Cincinnati in the Spring or Summer of 1889, but that at the request of Mr. Glenn he gave up this employment in order that he might give more attention to Mr. Glenn; that afterwards he declined an offer of employment at Vicksburg; also at the request of Mr. Glenn, and on the statement that at all events he could not take Mrs. Sayre unless he took him —Mr. Glenn.

The family thus formed changed their residence to the hills in the early part of the Summer of 1889. Mr. Glenn remained in about the same physical condition; that is, he was able to walk with the assistance of a cane or canes until August 13, 1889, when he was stricken with paraplegia, whereby his body, from his waist down, and including his bowels and his bladder, were entirely paralyzed.

Mr. Glenn probably anticipated this paralysis; at the time of the stroke Mrs. Sayre was not in the house; on her coming in, very shortly afterwards, he said to her "it has come at last." He seemed to appeal to her, and his appeal seemed to be answered by such manifestations of feelings that would be expected from a daughter to a father in his old age and great affliction, and by her promise that she would never allow him to feel the need of his legs.

From this time until the time of his death, she became his constant companion; she and her husband, assisted at times by nurses, nursed and attended him with the care that is not always received by a parent from a child. With the exception of the few occasions when it became necessary for the health of Mrs. Sayre that she should have rest—at which times she would leave for short visits—either she or her husband was at all times in the house.

The nature of his disease was such, that at periodical times of about each six or seven days, the duties required of the nurse were offensive in the extreme. At such times, when they had a nurse, such nurse attended him; but in the absence of such nurse Mr. and Mrs. Sayre performed all the duties required.

The duties imposed on Mrs. Sayre were arduous and painful; at times without the aid of a servant, she had the household work, in addition, on her shoulders.

She was his attendant, companion and nurse.

While nursing Mrs. Glenn, in her last sickness, Mrs. Sayre contracted a blood poisoning. She still suffered from the effects of this blood poison, and this, together with her constant attention to Mr. Glenn, made it necessary that she should have a recreation, and as a consequence on one occasion she was absent some weeks, and on other occasions she was absent a shorter time. During such absence her mother took her place as manager of the household and as nurse.

I think the testimony tends to show, that from the time of the paralysis, on August 13, 1889, to the time of his death, February 14, 1893, Mr. Glenn's physical condition grew gradually weaker. The bowels being paralyzed; there was no natural operation, and at intervals of about six days

he would take large doses of medicine—syrup of figs—and from the effects of which he would become sick. I think the testimony tends to show that. these spells 'of sickness, so produced, gradually wore out his physical strength and finally caused his death.

At times, other than during these spells, Mr. Glenn suffered no physical pain; he was in a pleasant frame of mind; was entertained by reading and by conversation in the house, and on pleasant days, spent much of his time in the open air in a chair built on wheels. He was sociable in his disposition, became acquainted with his neighbors on the sidewalks and in their yards, and enjoyed life as much as a man of his age and physical condition could.

I think the testimony tends to show that paraplegia does not affect the brain, and it seems to me that the testimony giving the history of Mr. Glenn after this attack of August 13, 1889, shows that his mind was not directly affected by this disease.

But Mr. Glenn was old and paralyzed. He had his gloomy days, occasioned by his periodical sickness. His mind was necessarily not so strong as when younger and in health, but I think the decided weight of the evidence is, that to within a short time of his death, he had sufficient mind and memory to transact business.

From August 13, 1889, to the time of his death, Mr. Glenn depended entirely upon Mrs. Sayre; she was the head of his household; she and her husband had charge of his nursing, and they themselves nursed him; he relied upon them entirely and exclusively for attention and for his comforts; he called on them at all times and at all hours of the day and night, and one or the other responded.

The responsibility of the management of the household, and of all affairs pertaining to the nursing of Mr. Glenn, rested upon Mrs. Sayre; she accepted this responsibility, and, advising with Mr. Glenn, she managed and controlled. One of the witnesses speaking of Mrs. Sayre in the management of the household, during the sickness of Mrs. Glenn, called her a general. The management of Mrs. Sayre, after August 13, 1889, was very similar to that during the sickness of Mrs. Glenn, and such management had been endorsed by Mr. Glenn, by his choosing her as his companion after the death of Mrs. Glenn, and I think her management after the death of Mrs. Glenn was fully appreciated and entirely approved by him.

I think it is evident that there was not a cordial feeling between Mrs. Sayre and the relations of Mr. and Mrs. Glenn, other than the mother of Mrs. Sayre; they were polite and courteous to one another; but it was an armed neutrality.

She used her own discretion as to admitting visitors to see Mr. Glenn; her discretion being exercised, as I think, for the benefit of Mr. Glenn, and without any regard whatever for the feelings of the visitor. I think the testimony tends to show that on a few occasions some of the relations were not allowed to see Mr. Glenn, but the reason given by Mrs. Sayre would seem to be reasonable. I think that when the relations called they were, in nearly all cases, shown to Mr. Glenn's room by Mr. or Mrs. Sayre, or by Mrs. Sayre's mother, and that one or the other of them remained in the room during the visit. It is claimed that the relations were not allowed to see Mr. Glenn alone. I think, however, that on a few occasions one or more of them did see him alone, and I think that on no occasion was either of them precluded from seeing him alone when a request therefor was made.

On January 4, 1889, Mr. Glenn, by indorsements on the deeds, gave his lots in Spring Grove Cemetery, on his death, to Mrs. Sayre. The indorsements were witnessed by Mr. Newell and Mr. Lytle.

In September, 1889, Mr. Glenn sent for Mr. White, president of the Fourth National Bank, and Mr. White visited him. Mr. White says Mr. Glenn told him that Mrs. Sayre was not his adopted daughter; that he had made a mistake in not adopting her; that he had left her $15,000 by his will; that he was fearful she would not get it; that he had only a short time to live and that he wished to arrange the matter. Mr. White told him to pay her the money in his life time. He said he had no money. Mr. White then said to him that he had stocks; to transfer the stocks to her. He said he had need of the income to keep him, upon which Mr. White suggested that he had confidence in Mrs. Sayre, and that he should make a reservation of the income, and told him he could add a codicil to his will, to the effect that the money was paid. Mr. Glenn asked him to call Amanda and she could get the will, so Mr. White could write on the will that the bequest was paid. But Mr. White declined to do any writing. The will was then in the hands of his attorney which seemed to have been forgotten by Mr. Glenn.

Mr. Glenn thereupon sent for the attorney, Mr. Shattuck, who had charge of his will. Mr. Shattuck says Mr. Glenn told him that he wanted to give Mrs. Sayre the $15,000 outright; that he was doing it to satisfy Mrs. Sayre, as she was afraid the blood relations would upset the will. Mr. Shattuck drew a codicil to the will, and Mr. Glenn transferred to Mrs. Sayre seventy-five shares of the capital stock of the Fourth National Bank, estimated to be of the value of $15,000.

At this time a deed of gift of the household furniture was executed by Mr. Glenn to Mrs. Sayre.

The testimony tends to show that in the Winter of 1891, Mr. Glenn became dissatisfied with the house in which they were then living; and I think from the testimony, he had cause for wishing another house; he wanted one in which he could get more sunlight; there was a dump in the rear of the house in which they were living; the street in front of the house was torn up, being paved with granite, so that it was difficult for him to be taken out in his wheeled chair. During the Winter and Spring Mr. and Mrs. Sayre looked for another house; for the purpose of renting one that would be pleasant to them and satisfactory to Mr. Glenn. They were not successful in finding a house which they could rent, but they saw a house on Fairfield avenue which was for sale. In talking the matter over with Mr. Glenn, they mentioned this house, and at Mr. Glenn's request, they took him to see it; but finding that it could not be rented, nothing came of the visit. Some days afterwards Mr. Glenn asked them to take him over to see the house again, and then finding the agent there, he went in and examined the house. Mr. Sayre continued hunting a house to rent, but failing to find one, Mr. Glenn told Mrs. Sayre that he had about made up his mind to buy the Fairfield avenue house, and give it to her; that it would be a home for him while he lieved and a home for her after his death; that he had felt that he had kept Lancing (Mr. Sayre) out of business, and from getting a position, and he thought he ought to give her a home.

Negotiations were thereupon entered into, the house was purchased on May 25, 1891, for $16,000; the conveyance was made to Mrs. Amanda G. Sayre. The consideration was paid $11,100 money arising from the sale of stocks then given by Mr. Glenn to Mrs. Sayre; $900 in money of Mrs. Sayre; $4,000 mortgage executed by Mrs. Sayre.

Within a short time after the purchase of the house an additional lot of ground, being a strip about ten feet in breadth adjoining, was also purchased by Mr. Glenn, at the suggestion of Mrs. Sayre, for the purpose of

protecting some trees; the conveyance being made to Mrs. Sayre for the consideration of $500.

Several witnesses testify as to statements made by Mr. Glenn of his intention to purchase the house for Mrs. Sayre, or of his having purchased it for her. He told Mrs. Osborne that he wanted to give the house to Amanda, while he lived, for she had been a good kind girl to him.

In July following, Mr. Glenn gave Mrs. Sayre twenty shares of stock of the Fourth National Bank under the following circumstances: Mr. Glenn had had one of his periodical spells of sickness and Mrs. Sayre had been ailing, and they were both sitting up for the first time in his sitting room. He said to her that he was afraid that he was going to die, and if he died, that mortgage would be on the house, and it would not all belong to her. He told Mrs. Sayre to get the tin box, in which he kept his stock certificates; which she did. He thereupon took out the stocks, and looked them over, and picked out a certificate for twenty shares of the Fourth National Bank stock. He said he thought that it would pay off every thing on the house, and he was going to give it to her then, which he did.

This stock was duly transferred on the books of the bank to Mrs. Sayre within a few days.

On the Sunday following, Mr. De Camp, one of the officers of the Fourth National Bank, called and remarked to Mr. Glenn: "I see you have been transferring stock to Amanda," he said: "Yes, I did that, Amanda has taken good care of me, given me a good home."

Mrs. Sayre says that the stock was not then sold and applied in payment of the mortgage, as Mr. De Camp suggested to Mr. Glenn, that it would raise in value, and that it should be held, to which Mr. Glenn assented.

On October 6, 1892, Mr. Glenn gave Mrs. Sayre ten shares of the Fourth National Bank stock. Mrs. Sayre testifies: "He told me to get his tin box, when I was sitting in his room reading to him. And he looked over all the papers in it, and he spoke of there being just one certificate of Fourth National Bank stock for ten shares, he thought he might as well give me that, as I had all that was not down at the bank as collateral excepting that; he gave it to me that day."

This certificate of stock was duly transferred on the books of the bank within a few days.

Mr. De Camp, says his impression is that he also spoke to Mr. Gleen about this transfer, and that Mr. Gleen answered him about the same as he had done on the former occasion.

There is no evidence that Mrs. Sayre, or any one on her behalf, ever solicited Mr. Glenn to make either of these gifts to her. On the contrary, the evidence is that she never did solicit him to make either of the gifts, or said anything to him to induce him to do so.

Mr. Glenn's blood relations were the descendants of his brother; all of whom were wealthy people. The relations of his wife were her sisters and descendants of her sisters, who were poor or only in moderate financial circumstances.

It is claimed on the part of the plaintiffs that Mr. Glenn was of unsound, or at all events of weak mind, at the time of the purchase of the house and of the transfer of the twenty shares and of the ten shares of stock; that a fiduciary relationship existed between Mrs. Sayre and Mr. Glenn; and that the said transactions were obtained by the undue influence of the defendants, Amanda G. Sayre and Lancing Sayre, and that therefore such transactions should be set aside as fraudulent and void.

I think it well settled, that the rule applicable to transactions between persons standing in a confidential relationship to each other, stands

on a general principle applying to all the variety of relations by which dominion may be exercised by one person over another. Ch. Div., 1893, vol. 1, p. 752; 6 Cold. 440; 108 N. Y. 25, also that:

Where a confidential or fiduciary relation is shown to exist, the burden is upon the person, taking securities or contracts enuring to his benefit, to show that the transaction is just and fair (108 N Y. 25, 28, 29; 113 N. Y. 462); to show that it was fair in itself, and in its nature and effect fully understood (53 Conn. 299; 32 Ohio St. 240).

In the case of Christmas v. Spink et al., 15 Ohio, 600, the bill was filed to set aside a conveyance on the ground of inadequacy of consideration, and weakness of mind of the grantor, and of undue influence on the part of a son for whose benefit the conveyance was claimed to have been made. In passing on the matter Judge Hitchcock says (Ib. 604): "The first charge is, that John Christmas was old and weak in body and mind. The testimony sustains this charge, but it does not show that his mental faculties were so far impaired that a conveyance made by him could be avoided on this account. * * * The next charge is, that he put great confidence in his son William, and that William exercised a controling influence over him. That he put great trust and confidence in William is abundantly proved. That William had influence over him is also proved. But that he had any controling influence does not appear. * * * It is next charged that, with a view to defraud the complainants of their legacies, he exerted his influence with his father to induce him to make the conveyance to Fossit. Of this there is no proof. There is no testimony that he ever solicited or even advised his father to make that conveyance. It is not improbable that he did so advise, but it is mere presumption." This is followed by the case of Tracy v. Sacket, 1 Ohio St. 54. This was an action growing out of a contract between parties not related. Sacket was old and addicted to intemperance, and of weak mind. At the instance of Tracy, Sacket conveyed to him 80 acres of land, and transferred to him other property; in consideration for which Tracy agreed to maintain Sacket and his wife for life, etc. The court found that there was great weakness of mind on the part of Sacket; that there was an inadequacy of consideration; and an overreaching and undue influence, and an unconscionable advantage on the part of Tracy, which, in a court of equity would justify the setting aside of the contract. Judge Bartley says (Ib.) 60:

"The rule to be collected from all the authorities I take to be this: where there is imbecility or weakness of mind arising from old age, sickness, intemperance, or other cause, and plain inadequacy of consideration; or when there is weakness of mind, and circumstances of undue influence and advantage, in either case, a contract will be set aside in equity."

The first clause of this rule clearly applies only to contracts, not to gifts; but the last clause I take it, will apply to a gift. This is followed by Hardy v. Harlingen, 7 Ohio St. 209. A wife, who had the exclusive interest and control of her property by reason of an ante-nuptial contract, passed money into the hands of her husband who invested them in lands, taking title in his own name.

Judge Scott says (Ib. 216): "There is no doubt that courts should narrowly scrutinize cases of alleged gifts from the wife to the husband, and should promptly set them aside whenever there is good reason to believe that they have been procured by the improper exertion of that influence, which the relation of the parties to each other puts in the power of the husband. The transaction will be viewed with a jealous eye on account of the peculiar facilities enjoyed by the husband for the exercise of an improper influence. At the same time undue influence is not to be presumed from the mere relation of the parties It must be shown either by direct

proof or by circumstances from which it may fairly be inferred. * * * The mass of testimony leaves no doubt upon our minds that Mrs. Van Harlingen gave to her husband the money which was drawn from the executor, intending to make it his property. No undue influence is shown, and the gift must, therefore, be held valid." This is followed by Berkmeyer v. Kellerman, 32 Ohio St. 239. In this case, a child—a girl—on the day she arrived at age of majority, executed a deed for property to her mother and stepfather. The first she knew of what was being done, was after the deeds were ready to be signed, and while on her way to the notary's office, where she was taken by her mother to execute them—her mother telling her they were going to settle about the property there, and settle it fair for all. When there, the notary told her that her father and mother had been there two days before, and had fixed it all up; that the papers were all made up, and that 'she had just to put her name under, and that was all she had to do.'

A priest who happened to be there heard the papers explained and says that the girl signed without objection.

The court found that the mother stood in peculiar relation to the girl; she had the custody and control, exercising care of her nurture and maintenance till her marriage, after the settlement; that the mother and stepfather stood in loco parentis; that courts of equity are especially charged with the cognizance of trust relations of this character. "It is their particular duty, in case of children and other helpless persons, to protect the weak, and to prevent those holding fiduciary relations from using their positions and influence for their own aggrandizement. All their power, influence and skill is to be used for the benefit and advantage of the beneficial owners, and not for personal gain." (Ib. 250). The court reviewed a number of authorities and held (Ib. 254): "Guided by these principles, we are unanimous in the opinion that this deed, made on the day Lissette became 18 years old, in execution of an alleged settlement, made by one unauthorized to bind her, without her being fully advised of her rights, and while acting under the influence and control of her mother and stepfather, was not binding upon her."

I think on these authorities, I may hold, that the relationship of Mrs. Sayre and Mr. Glenn was either, that of a confidential relationship; or that of a fiduciary relationship; that in either case it is incumbent on Mrs. Sayre to show that the transactions were fair in themselves, and in their nature and effect fully understood by Mr. Glenn; if she makes such showing, by the preponderance of the evidence, the transactions will be held to be valid; if she fails in this, the transactions will be held to be invalid.

I think the weight of the evidence is, that in the purchase of the house and conveyance of the same to Mrs. Sayre, and in the transfer of the twenty shares of stock, and in the transfer of the ten shares of stock; Mr. Glenn comprehended and understood what he was doing; that he comprehended the amount and nature of his estate; that he intended to make the house and the stocks the property of Mrs. Sayre.

There is no evidence directly showing undue influence. The evidence on the part of the defendants is that they did nothing and said nothing to influence Mr. Glenn in either of said transactions, and there is no evidence to the contrary.

The plaintiffs claim that the relationship existing between Amanda G. Sayre and Mr. Glenn, at and prior to the time of such transactions, was of a fiduciary character; that when Mrs. Sayre agreed in 1888 to live with Mr. Glenn, such relation arose, and that such relation was renewed, or at all events, arose, when in 1889, at the time of the stroke of paralysis,

Mrs. Sayre promised to care for him; that it was not competent for Mrs. Sayre to enter into any transaction with Mr. Glenn, out of which she would receive a benefit, after such relation arose.

If it be true that a fiduciary relation arose out of the agreement on the part of Mrs. Sayre to live with Mr. Glenn and take care of him, then on the promise on her part being accepted by him, or on the request on his part being acceeded to by her, an obligation was imposed on Mr. Glenn to compensate her for her services. In complying with this obligation, Mr. Glenn entered into no new transaction. The obligation was entered into, at or before the fiduciary relation arose; it was therefore voluntary and free from undue influence. Mr. Glenn may, during the existence of the fiduciary relation, comply with his part of the contract. This proposition seems to be sustained by the court in Allcard v. Skinner, L. R., 36 Ch. Div. 145, in which the court held that the donor having, before she joined the sisterhood, devoted her whole fortune to it, the subsequent acts in carrying out the object, were matters of detail. Ib. 168.

If, therefore, Mr. Glenn was under obligation to pay, he could do so, and he could determine the amount he should pay, and his payment would be held valid, unless it should appear that the amount paid was unconscionable.

In determining whether the amounts given—if considered as payment for services—were reasonable or not unconscionable, we must consider, with the other circumstances, the fact that Mr. Glenn had no children; that his blood relations, who would inherit, were wealthy, and did not need his money; that he was under no obligation to the relations of his wife; that all his comforts depended on the person to whom he was paying; that he was able to be generous to her and probably wished to be generous; that the amounts so paid furnished him a pleasant home for the remainder of his life; that the income of the stocks was applied in his support.

I do not think the amounts, if taken as payments for services, were unconscionable.

It is claimed by the plaintiffs that, it being shown that a fiduciary or a confidential relationship existed, undue influence may be implied from such relationship. In Hoghton v. Hoghton, 15 Beavan, 278, the court say on page 299: "In many cases, the court, from the relations existing between the parties to the transaction, infers the probability of such undue influence having been exerted." That was a case where a son, shortly after arriving at age, prior to a complete 'emancipation,' made settlements, by deed, with the father, the contents of the deeds not being made known to the son, and the father getting the benefit. But in Hardy v. Harlinger, 7 Ohio St. 216 (supra), the court say that undue influence is not to be presumed from the mere relation of the parties; that it must be shown by direct proof or by circumstances from which it may fairly be inferred.

It is claimed by the plaintiffs that Mrs. Sayre was bound to have afforded "independent advice" to Mr. Glenn in each of the transactions, and that the failure to afford such advice, is fatal to the validity of the transaction.

In support of this proposition they cite Hoghton v. Hoghton, 15 Beavan, 278. In this case the question of the validity of deeds executed by a son lately arrived at age, not completely emancipated, in resettlement of the family estate; and in which the father acquired benefits; the court say (Ib. 308): "In the first place, the evidence establishes conclusively

that so far as the preparation of this deed is concerned the plaintiff had no professional advice or assistance." The court found the deed one not easily to be understood (311) that the explanations given the son were not sufficient to enable him to understand it (313). This is one of the elements considered; a part of the circumstances of the case.

In Allcard v. Skinner, L. R. 36, Ch. Div. 145, in which a gift to a religious order was obtained by undue influence of a "Superior," whose voice, under the rules of the association, was the voice of God, Kekewick, J., says (Ib. 158): "The law does not prohibit gifts to sisterhood by members any more than it prohibits gifts by wards to guardians, or by children to parents; but, when the paramount influence presumably exists, it casts on the possessor of such influence the burthen of proving that the gift was free, and it holds an essential part of that proof to be that the donor had competent independent advice," but, reviewing authorities, held that it was not necessary that such advice be legal advice. This case would seem to hold "independent advice" to be a sine qua non, in cases where paramount influence presumably exists.

In Morley v. Loughnan, Ch. Div., 1893, vol. 1, p. 751, the court say there is no doubt about the law which is illustrated by numerous cases collected in White & Tudor's work under leading cases of Hugnenin v. Basely, 14 Vesey, 273, down to Allcard v. Skinner, 36 Ch. Div. 145: "That law is, that where large voluntary gifts are made and accepted inter vivos, the recipient my be called upon to show that the donor had capacity and knowledge of what he was doing. In this case that capacity and knowledge are not disputed. Proof may then be given against the recipient to show that the donor's intention to give was produced by undue influence, and then the courts, of course, set it aside, unless the transaction as a whole was a benefit to the donor. Or the donor may show that confidential relationship existed between the donor and the recipient, and then the law on grounds of public policy presumes that the gift, even though in fact freely made, was the effect of the influence induced by those relations, and the burthen lies on the recipient to show that the donor had independent advice, or adopted the transaction after the influence was removed, or some equivalent circumstances."

In this case it appears that the father of the donor engaged and paid the defendant the donee to act as a traveling companion for the donor: that very large gifts were made to the defendant from £2,500 to £65,000 a year, "the very magnitude of these transactions seems * * * to raise a presumption of influence or infatuation." The donor during the time was in a low, feeble and morbid condition, suffering from great depression produced by large and continued doses of bromid of potassium, trouble or loss of memory and apprehensive, at times, of catalepsey, paralysis and even on one occasion of insanity. The evidence of undue influence as stated in the opinion, was abundant and so clear that the court found that the gifts were not the result of the donor's own free will, but the effect of that influence and dominion.

In 92 Cal. 632, the court, referring to the English cases, says that the transactions will not be upheld, unless it shall be shown that the donor had independent advice, etc.

In 147 Pa. St. 634, the court note the fact that the donor had had no independent advice as one of the elements to be considered.

From my examination of this case, I think the court followed the Enlgish cases.

In 34 N. J. Eq. 575, the court citing the earlier English cases follows the rule therein laid down.

In Allore v. Jewell, 94 U. S. 506, the court citing L. R. 10 Ch. App.

Cas. 15, as to independent advice, and reciting that one of the justices in that case had observed that the (English) court had endeavored to prevent persons subject to influence from being induced to enter into transactions without advice of that kind, held, (Ib. 512): that the principle upon which the court acts in requiring independent advice "may always be invoked on behalf of persons in the situation of the deceased spinster, in this case, of doubtful sanity, living entirely by herself, without friends to take care of her, and confined to her home by sickness."

In these American cases the rule of the English cases prior to Morley v. Loughnan is followed, and in Allore v. Jewell, 94 U. S. 512, the court finds it applicable to the specific case there stated, which is a strong case of mental weakness and desertion.

In the case of Mitchell v. Homfray, L. R. 8, Q. B. 587, the court refers to the case of Rhodes v. Bate, L. R. 1, Ch. 252, in which independent advice was held to be necessary, and holds that a subsequent ratification dispenses with the necessity. This seems to be a slight departure from the rule.

But it seems to me the rule of the earlier English cases is greatly modified, if not entirely done away with, so far as it makes the independent advice a sine qua non, by Morley v. Loughnan (supra), in which the court holds that on a showing being made that confidential relationship existed, the burden is on the recipient to show that the donor had independent advice, or adopted the transaction after the influence was removed, or some equivalent circumstance.

That is, the recipient may overcome the presumption growing out of the confidential relation by showing: first, independent advice; or second, ratification; or third, some equivalent circumstance.

The court in 33 Md. 194, would not follow the rule of the earlier English cases.

I am referred to no case in Ohio following the rule as laid down in Allcard v. Skinner. The court in 32 Ohio St. 254, cited Hoghton v. Hoghton, but not with reference to this rule.

I think the rule laid down in Morley v. Loughnan the more reasonable and just, and that the failure to afford independent advice to Mr. Glenn, is not conclusive of the case; but is a circumstance to be considered with all the other circumstances in the case.

The plaintiffs further claim that the circumstances of the case are such that undue influence of Mrs. Sayre over Mr. Glenn, in the transaction, will be presumed.

From the circumstances, imposition or undue influence may be presumed. 94 U. S. 511; 7 Ohio St. 216.

In Huguenin v. Basely, 14 Vesey, 273, in which a settlement by a widow on a clergyman was set aside as obtained by undue influence and abused confidence. Lord Eldon says (Ib. 299): "The question is, not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced."

I think, therefore, the question in this case is, how was the intention of Mr. Glenn, in these transactions, produced.

The plaintiffs claim that Mrs. Sayre prevented the relations from seeing Mr. Glenn alone; that on their visits, either Mr. or Mrs. Sayre, or Mrs. Lytle would remain in the room. I think, on a few occasions, they did see and talk with him alone, and that when request was made, they were not prevented from seeing him alone.

They claim that the bearing of Mrs. Sayre, towards the relations, was such as to give them to understand they were not welcome; and that therefore they were precluded from making visits more often.

They claim further that Mrs. Sayre was evasive in her answers on cross-examination, and cite 46 Mich. 170, to the effect that evasive and contradictory answers will increase the burden already resting on her.

The cross-examination of Mrs. Sayre was very long and exhaustive; she at times answered that she did not know, or did not remember: but I do not think she intentionally evaded questions.

Her manner of testifying, on cross-examination, is, however, a circumstance to be considered.

The evidence shows that a new will was executed in February, 1892, by Mr. Glenn by the terms of which he bequeathed all his property to Mrs. Sayre, and it is claimed that this fact tends to show undue influence.

This tends to show intention on the part of Mr. Glenn to give all his property to Mrs. Sayre, and so far as the circumstance has a bearing on the issues in the case, it is necessary to determine how this intention was produced. 14 Vesey, 299 (supra).

Schouler in sec. 238 of his work on Wills, says: "The harmony of the will with the testator's habitual disposition and affections, while physically and mentally sound, is thus eminently worthy of consideration.

In determining the question; how was the intention of Mr. Glenn produced, we must therefore look to all the evidence in the case, remembering that when the question agitated is a gift, the rule would seem to be more stringent than when the advantage flows from a contract or mutual arrangement. 1 Atlantic Rep. 385; 34 N. J. Eq. 575.

In this connection I have examined the cases cited by the plaintiffs:

In 5 Del. Ch. 374, the court found the farm conveyed to a son and daughter to be worth $15,000 to $20,000; that the grantor had five children living and no alienation of feeing; that the personal estate was small; that the design to convey was not proved to have originated with the grantor, but might be presumed from the evidence to have originated with the grantees; that the conveyance was without consideration; that the grantor was of great weakness of mind; that the nature and legal effect of the deed was not sufficiently explained and there was not sufficient proof that he understood or comprehended them. Ib. 394. In this case the testimony of the doctors, and which was relied upon by the court, was to the effect, that on their examination, a year after the execution of the deed, the grantor was in a state of senile imbecility, and that humanly speaking it was impossible that at the time of the execution of the deed, the grantor could have been competent to transact business of that character. The only testimony as to why the deed was executed was that the idea of conveying the property originated with the grantees, and that the grantor was not told of it, nor consulted about it till the afternoon of the day when the conveyance was executed. Ib. 393.

In 147 Pa. St. 624, the testator, 84 years of age, went in July, 1889, to live with his nephew; on July 19, 1889, he executed a power of attorney to his nephew, authorizing him to transact his business, and to do whatever might seem to him proper "for the protection of myself and my estate;" on November 6, 1889, he executed a note for $7,000 to his nephew for past services and for taking care of him during his life; the testator died in December, 1890; the court found that there was no past services; and that an allowance had been made to the nephew covering service rendered by him, aside from the $7,000 (Ib. 634), and held, that a confidential relationship arose out of the power of attorney; and that "such contract, in such circumstances, is grossly unreasonable and unconscionable and cannot be sustained. Ib. 635.

In 32 Minn. 25, the defendant, the mother of the plaintiff, and a uncle of the plaintiff, were the guardians of the plaintiff; on the day that

plaintiff became of age the guardians delivered to the plaintiff a check for $6,842, being the money belonging to her found in her guardians' hands; the plaintiff immediately indorsed and delivered the check to defendant; on the same day she executed and delivered to defendant four deeds conveying certain real estate, also a bill of sale for personal property; there was no consideration whatever for the same. The court below found as a fact that the plaintiff did not make the gift of her own free will, and that it was not her voluntary act, and was made under the false impression derived from an unsigned draft of a will, left by her father, and from conversations with, and statements made by her mother, the defendant, that in executing such conveyances she was carrying out the wishes of her deceased father (Ib. 36), and he d them void.

In 46 Mich. 166, the donor, 82 years of age, was living in the family of his nephew; he was mentally and physically in good condition for a man of his age till March, 1878; early in March he became seriously ill and on the 18th of the month his physicians announced his case hopeless, he lived however until the 15th of April; between the 3rd of April and the day of his death the nephew procured from him assignments and transfers of seven mortgages, two being made on the day of his death constituting nearly all of his property, and leaving him insufficient to pay his debts. The evidence as to whether the grantor knew what he was doing was contradictory, and the court say "the case is not without circumstances which suggest that actual deception was practiced when the old man was too feeble to detect it."

The case of Tyler v. Gardiner, 35 N. Y. 559, is one containing so many elements of mental weakness, undue influence and fraud, that it is hardly applicable to the case at bar.

In Biglow on the Law of Fraud, 359, it is laid down that the principles applicable to gifts by children to their parents, apply where the natural position of the parties has become reversed, and the child has become the guardian of his aged or infirm parent. See also 49 N. J. Eq. 199; 21 Md. 353.

Cases like the present must each stand upon its own facts (118 U. S, 133), and I do not think the facts in the case at bar make it a case which can be determined by these cases cited. They are cases in which there was great mental weakness, or evident undue influence and rapaciousness or unconscionable transactions. From the circumstances shown in these cases, undue influence might well be presumed.

In the case of Allore v. Jewell, 94 U. S. 506, in which the court laid down the doctrine that, from circumstances, imposition or undue influence will be presumed, the court had found that the evidence established, that, "if the deceased was not affected with insanity for some years before her death, her mind wandered so near the line which divides sanity from insanity, as to render any important business transaction with her of doubtful propriety, and to justify a careful scrutiny into its fairness. Ib. 508. The physician testified that in his opinion she was not competent in November (when she executed the deed) during her last sickness, to understand a document like the instrument executed (Ib. 509), that the consideration "was an insignificant one compared with the value of the property" (Ib. 510); that the court was not satisfied that at the time she executed the conveyance she was capable of comprehending fully the nature and effect of the transaction. Ib. The purchaser was a stranger—not related to her—but acting with knowledge. The court held the conveyance void.

This is followed by the case of Conley v. Nailer, 118 U. S. 127, and in which Allore v. Jewell was cited by the plaintiffs' counsel as an authority;

but the court distinguished between the facts in that case and the facts in the case they were then considering, and refused to presume either imposition or undue influence from the circumstances, and sustained the conveyance, although the testimony as to the mental condition and capacity was conflicting.

Considering the testimony in the case it seems to me, that the influence which produced the intention of Milton Glenn to transfer the property to Amanda G. Sayre, and to make it her property, grew out of his relation with her as a girl and woman. She was the adopted child (adopted in fact but not in law) of his old age. He was 53 years old when she was born; she at once became his favorite and the affection of himself and of Mrs. Glenn for her became so great, that when she arrived at the age of 14, she left her home and became a member of their family, and from that time was considered and treated as an only child; she was brought up, maintained and educated like a daughter; she was married from their home, with their consent and approbation; after her marriage she and her husband were assisted, by sums of money, in taking vacation trips, presents were made to her; Mr. Glenn advanced $5,000 to assist her husband in his business, which money was afterwards given to her; Mrs. Glenn, with the approval of Mr. Glenn, made her the residuary legatee of her will, at a time when she (Mrs. Glenn) was the sole legatee in Mr. Glenn's will; by a subsequent will Mr. Glenn bequeathed $15,000 to her out of his estate of $50,000, dividing the balance in much smaller sums. When trouble came, and assistance was needed, they sent for Amanda, and when Mrs. Glenn died and Mr. Glenn was left alone, he turned to Amanda, as to a daughter, and she was chosen to live with, take care of, and be his companion.

His blood relations—his heirs at law—were wealthy, more so than he. His relation with his wife's relatives were kindly, but they were living away from him; they were not dear to him, as the girl he had brought up.

She was his companion and his nurse, and I think she devoted herself entirely to him, and I think he fully appreciated all she did for him.

This is the influence that produced the intent; giving to Amanda had become a habit, and undoubtedly a pleasure. She was the one who made his last years more tolerable. He was under no obligation to any one else. Why should he not give to her? He had done so in the days when he was strong and she was weak—needed his assistance and care; should he cease in the days when he was the weak one who needed her assistance and care. It was his property; he had earned it, it was his to dispose of at his pleasure by gift or otherwise. 7 Ohio St. 216. It was sufficient to carry him through life, and should he not use it in such way as would give him a home, nursing and companionship, which was a benefit to him (Ch. Div. 1893, vol. 1, p. 752), and give a home and support to the person who stood to him as a child.

In my opinion the influence which produced the intention of Milton Glenn, in said transactions, was not an undue influence.

In my opinion the transactions, by which the real estate was conveyed to Amanda G. Sayre, and the twenty shares and the ten shares of stock in the Fourth National Bank were transferred to her, were valid, and gave good title to her.

I am therefore of the opinion that the plaintiffs are not entitled to the relief asked, and that the petition should be dismissed.

Paxton & Warrington, and Stephens, Lincoln & Smith, for plaintiff.

A. L. Brown, Ramsey & Maxwell, and T. A. Logan, for defendants.