CHARLES GRIMMINGER

*v.*

JOHN ALDERTON et al.

[Submitted October 24th, 1914. Decided January 21st, 1915.]

1. Complainant was mentally incompetent, and his wife, who had married him to secure his property, procured his conveyance of all his property to a third person, and thence to them in their joint names, both without consideration, and afterwards procured his deed to her relatives living in the same house, so that thereby he was divested of substantially all interest in the property of record, and was unable to work and dependent upon the grantees, and had not had the benefit of independent advice.—*Held*, that complainant might have the conveyances set aside, in the absence of the grantees' proof of the fairness of the transaction.

2. In such case the conveyances would not be allowed to stand, without proof that the grantor understood the nature of the transaction.

3. A husband's conveyance of realty to himself and his wife vested in them the lands in common, each holding one-half during their joint lives with survivorship as at common law.

*Mr. Frank G. Turner,* for the complainant.

*Mr. Charles E. S. Simpson,* for the defendants.

GRIFFIN, V. C.

The bill in this cause is filed to set aside three conveyances made as follows: (a) by the complainant and wife, Frances, to John Alderton; (b) by John Alderton and wife to the complainant and wife, Frances (both made April 26th, 1907); (c) by the complainant and his wife, Frances, to John Alderton and Alice Alderton, his wife (made April 28th, 1911).

At the time these conveyances were made complainant had no other property.

The complainant and defendant Frances were married on October 25th, 1906, after an acquaintanceship of four months. From childhood the complainant had been, and still is, mentally deficient, being, as it is said, an epileptic. The brother of the complainant, upon learning of the prospective marriage, acquainted Frances of the complainant's condition, urged her not to marry him, but she replied that she would marry him in spite of his condition. This she denies.

At the time she became acquainted with him there was pending in chancery a suit for the partition of the estate of complainant's father—the complainant and one other brother were represented by Messrs. Vredenburgh, Wall & Van Winkle, the case being in charge of Mr. Van Winkle.

Prior to the marriage, and also to the payment of complainant's share of the proceeds of sale in partition, and before the complainant purchased the premises in question, Frances sought to obtain from Mr. Van Winkle information as to what complainant would receive from the partition suit. Mr. Van Winkle testified as follows:

"Q. Can you tell what the conversation was?

"A. Well, I can only recall the substance of it. The substance of the conversation was a request by her of me to ascertain how much money was coming to Charles Grimminger from his father's estate.

"By the Vice-Chancellor—Were they married at that time?

"A. Unmarried, sir. She introduced herself, and I understood from her at that time that she was to marry Charles Grimminger; and I viewed him as a man unfit to marry, because of this condition; and I was very short and peremptory with this lady, and gave her little information."

This Frances also denies.

On October 5th, 1906, Mr. Van Winkle, on the written authority of the complainant, sent a check to Michael Grimminger, the brother of the complainant, for $7,235.14, being the balance due the complainant upon his share in the partition suit, to be by him deposited in the New Jersey Title Guarantee and Trust Company as a special deposit in the name of George Grimminger, trustee. This, Mr. Van Winkle says, was done because he viewed the complainant as a person unfit to handle so large a sum of money.

Prior to the receipt of these moneys the complainant had entered into a contract for the purchase of the premises in question for $5,000, the deed for which, while dated and acknowledged September, 1906, was not delivered, nor the consideration paid until about October 12th, 1906, the date of record; the purchase price having been paid out of the moneys received in the partition suit; adding to this the sum of about $1,300 paid for his board accrued prior thereto, a small sum remained in his hands out of the moneys received from the suit.

The complainant and Frances spent their honeymoon in Washington, and while there the complainant had a fit. This, she says, was the first intimation she had that he was so afflicted.

Immediately after the wedding the complainant and his wife moved into the premises and occupied substantially one-half, at the same time the Aldertons, parents of Frances, entered into the occupancy of the other half. Defendants say that the Aldertons, on entering, paid $11, and, later, $14 a month as rent for the portion occupied by them.

From October, 1906, until July, 1910, the occupants of this house were the complainant and defendants and a son of the

Aldertons named William, all of whom practically lived together as a single family. During this period no light is shed upon the relations existing between the complainant and defendants, save only such as comes from the defendants—William not being called. Little weight can be given to what the complainant says, because of his mental condition; his stories are contradictory; he is forgetful, has little idea of time, place and circumstances. To illustrate: He says his child (born in 1909) lived three or four years, whereas she lived but six months. He did not remember, until his memory was refreshed, that he occupied the house with the Aldertons until after this suit was commenced, and he was advised by his counsel to leave, but, on the contrary, said he thought he lived at the Boulevard Hotel, in 1911, whereas the time was 1913. And in numerous other instances he showed his utter lack of memory and understanding. He spoke freely, without any attempt to dissemble; his manner, personal appearance and speech clearly indicated a weak and disordered mind. His condition also was such as to render him unfit for work, and of this he did very little, and was therefore dependent upon the property in question and the defendants for his livelihood.

Frances, in speaking of the making of the deeds, in 1907, on direct examination, testified as follows:

"*Q.* At whose suggestion was that done?
"*A.* Well, we talked about it, and I said, 'Why don't you have my name on it,' and he said, 'Well, I will see,' and then I guess he thought it over, and after that he came back and said, 'We will go up to Brown and get Mr. Brown to do it,' and that is how we came to do it."

And, on cross-examination, she said:

"*Q.* And were you afraid he might die as the result of these fits?
"*A.* Well, I didn't know what would happen.
"*Q.* Was that the thing, because of the fits, that caused you to have the property made over in your name?
"*A.* No, sir.
"*Q.* What was the reason?
"*A.* Well, I thought it was right that I should have my name on it.
"*Q.* You thought it was right you should have your name on it?
"*A.* Yes.
"*Q.* But you knew the property had been bought with his money, didn't you?
"*A.* Yes."

The testimony of complainant's witnesses demonstrates that the condition of the complainant for years before the filing of the bill and prior to his marriage was the same as on the date they testified, and, particularly, Mr. Van Winkle, a reputable member of the Hudson county bar, who knew the complainant since the beginning of 1906, says that his condition remained unchanged.

Mr. Brown, who drew the deeds, in 1907, recalls little of the circumstances attending the drawing and acknowledgment of the deeds—he simply states that, pursuing his custom, they were acknowledged in due form.

The condition of this young man in the household from October, 1906, until July, 1910, may be inferred from some of the statements of Mrs. Alderton, and from what transpired, after July, 1910, when Mrs. Price, a niece of Mrs. Alderton, came to board with the Aldertons. Mrs. Alderton says that there was nothing the matter with the complainant; that he was lazy, and could work just as well as her husband; that he did work to buy clothes. But this statement of his ability to work is simply absurd. His mental and physical condition was such that he could not work unless moved by some impelling force, in which case it would be difficult to believe that his services would satisfy any employer. I take it, from this, that his failure to work was a matter of frequent discussion in the family; and Mrs. Alderton says that the fact that he would not work, and money matters, were causes of dispute between the complainant and Frances.

On November 2d, 1908, complainant and his wife made a mortgage to a building loan association for the sum of $500 to raise funds, as Frances says, to cover the expenses of her approaching accouchement. There was about $100 deducted from the sum, and the balance paid by the attorney to Frances, in which transaction the complainant was evidently ignored. All of the rents paid by the Aldertons for the use of the premises were paid to the daughter Frances. According to the Aldertons' stories, about April 8th, 1911, there were arrears of taxes, water rents, interest and dues on the building loan mortgage, and the complainant, having no funds to pay the same, it is stated by

the defendants that the complainant actually solicited Alderton and his wife to take a deed of the property in their own names, so that the complainant and his wife would have a home, and that when the complainant reimbursed the Aldertons for their outlay, the property would be reconveyed to the complainant and his wife. The Aldertons say they did not want to take such a deed, but wanted the complainant to have the deed made to one of his brothers. He did not want this. Accordingly, the complainant and his wife made their full covenant warranty deed to John Alderton and Alice Alderton, his wife, conveying the fee-simple in said premises. At the time of this conveyance there was no memorandum signed by the Aldertons showing the terms upon which the deed was delivered, and no effort whatever made to protect the interest of the complainant. After the conveyance Alderton made the repairs to the premises, incurred expenses on account thereof, and did so without ever conferring with the complainant or asking his advice or permission to do so; and Alderton says he did not think that it was necessary that he should ask the consent or advice of the complainant in the matter.

The whole course of conduct of the defendants toward the complainant clearly indicates that they did not regard him as being worthy of any consideration. They, from the beginning, treated this property as their own, and did as they saw fit with respect thereto. Their treatment of the complainant, and his acquiescence in such treatment, are rather mute evidences of the mental weakness of the complainant and the domination which they exercised over him without protest; and, in fact, this suit would not have been brought were it not for the fact that after his wife obtained a divorce from him the complainant was led by his brothers to institute it.

On January 30th, 1913, Frances filed her petition for divorce against the complainant, charging that complainant had deserted her in the month of August, 1910, the petition being for statutory desertion. A decree *nisi* was entered in the suit April 29th, 1913. How, on the facts as shown in this case, such a divorce could be obtained, if Frances is truthful, is a mystery to me. But, in considering this case, I may only look into it in so

far as it may have a bearing on this controversy. The testimony shows that Frances occupied a room in this house with Mrs. Price from July, 1910, to April, 1913, and during all the time, from the date of their marriage down to April, 1913, the husband and wife lived under the same roof. Dealing with the deed given in 1911 by the complainant and his wife to the Aldertons, Frances said that they had stopped living together for about a week before the transfer was made to the father and mother because he did not work, and they were angry at one another. She says, "Then we got to talking again, and got to sleeping again together." Then she proceeds to testify as follows:

"*Q.* And then the transfer was made after you got to talking again?

"*A.* We talked the matter over first, and then after we got to speaking right, then he said he would turn it over.

"By the Vice-Chancellor—What did you say to him about turning it over?

"*A.* Well, the only thing I said to him was I thought it was a good idea if he would turn it over, then we would have a home for ourselves; then we would be sure of a place to live in.

"*Q.* Well, didn't you suggest to him that it ought to be turned over to your father and mother?

"*A.* Well, I asked him first, but then he was not willing at first; he went down and asked his brother first; and then he came back and he talked it over again, and he said he was willing to turn it over to my father and mother.

"*Q.* And after he turned it over to your father and mother, what were they to do?

"*A.* They were going to look after the place and keep the repairs up and everything, and pay the taxes, and keep everything right, and we should have a home.

"*Q.* Your father and mother were to give you and your husband a home?

"*A.* Yes; when we turned it over. That was the agreement that was made, that they would give us a home, and they were to look after the property and keep it in good repair."

Therefore, as at the time the deed was delivered on April 8th, 1911, they were living together, and the petition for divorce was filed on January 30th, 1913, the two-year period of desertion would not have expired until some time after April 8th, 1913; and, taking the case most favorably to the defendant Frances, the desertion could not have been continued, at the time of her filing the petition, for more than one year and nine months.

Passing what might be a fraud practiced on the court in procuring the divorce, the testimony of Frances has a very significant bearing on the means used to obtain the deed in 1911, and as tending to discredit the testimony of the defendants generally, and to show the complete domination that the defendants possessed over this young man. The Aldertons would have the court believe that they did not want to take this deed; and yet, their daughter, on her own story, patched up the quarrel with the complainant and resumed cohabitation apparently for the purpose of securing the execution of the deed. It may be that this same course was pursued in 1907 to compel him to execute the deed for the purpose of putting the property in their joint names.

Having eliminated the complainant from the ownership of the property, the interest of the defendants in the complainant, if any they had before, ceased. He was treated as an utter stranger in the household, permitted to sleep in the attic, and while writhing in these fits no attention was paid to him. If he died in one of them the Aldertons would own the property, and his death apparently would not grieve them. To consummate the transaction the daughter then sued for a divorce while they were all living in the same household. The petition and citation were served upon him there, and he either did not comprehend their contents or gave them no attention.

. To sum up the whole situation, the defendant Frances married the complainant after being fully apprised of his condition. She did not marry him for love, but to secure the benefits of his property. She first secured the transfer of the property to their joint names, so that it would become hers in the event of his death. Not content with that, some four years afterwards they induced him to make a deed which divested him of all interest in the property of record. Having thus secured everything that this unfortunate young man had, his wife then filed a bill for divorce to rid herself of him, alleging a desertion some seven months prior to a date when she says they occupied the same bed; and, having obtained her divorce, she married Goodman, her present husband, and now seeks to take to her new spouse one-half of the property which the complainant vested in her. It

seems to me that Frances, in her marriage to the complainant, and in her conduct towards him since, perpetrated, and intended to perpetrate, a gross fraud upon him. She did not enter into matrimony with the idea of becoming a loving, faithful spouse.

In so far as the gift to Frances by the deeds of 1907 is concerned, the case is much stronger in favor of the complainant than *Haydock* v. *Haydock, 34 N. J. Eq. 570.* There the husband made certain gifts to his wife of a portion of his property. He had become weakened from age and disease. While they lived together, and none but her brothers were about him, without the advice of independent counsel, he made the gifts of which she was the recipient. The court held that the burden was cast upon the donee to show the fairness of the transaction, saying:

"I take the rule to be settled that where a person enfeebled in mind by disease or old age, is so placed as to be likely to be subjected to the influence of another, and makes a voluntary disposition of property in favor of that person, the courts require proof of the fact that the donor understood the nature of the act. *Huguenin* v. *Baseley, 2 L. C. Eq. (4th Am. ed.), notes 1183, 1185; Am. Notes 1192, 1194.*

"The presumption against the validity of the gift is not limited to those instances where the relation of parent and child, guardian and ward or husband and wife exists, but in every instance where the relation between the donor and donee is one in which the latter has acquired a dominant position. The parent, by age, may come under the sway of his children. *Highberger* v. *Stiffler, 21 Md. 338.* And so, as in the present case, the husband may become the dependent of the wife, and their natural position become reversed. * * *

"The influence which is undue in cases of gifts *inter vivos,* is very different from that which is required to set aside a will. In testamentary cases, undue influence is always defined as coercion or fraud, but, *inter vivos,* no such definition is applied. Where parties hold positions in which one is more or less dependent upon the other, courts of equity hold that the weaker party must be protected, and they set aside his gifts if he had not proper

advice independently of the other. *Huguenin* v. *Baseley, supra, notes 1271.*"

In this case the mental .condition of the complainant was about the same as Haydock's. He lived in a household, surrounded by his wife, father-in-law, mother-in-law and brother-in-law. He was dependent upon them. So situated, he was easily dominated. When the deeds were executed he did not have the benefit of advice independent of the donee and her family. The gift had relation to substantially all the property he was possessed of, and resulted in vesting in the complainant and Frances, husband and wife, the lands in common, each holding one-half during their joint lives, with survivorship as at common law. *Buttlar* v. *Rosenblath, 42 N. J. Eq. 651, 657.* Before this gift was consummated he might at any time sell the premises, subject to his wife's inchoate right of dower, for a substantial sum; whereas, after the gift, considering his condition of health, it is unlikely that anyone would pay for his right and interest in the lands much more than a nominal sum. Thus, he divested himself by gift of all his property, excepting a share of the income, thereby losing the protection his prior estate might in future afford. Such a situation, applying the reasoning of Vice-Chancellor Stevens, in *Pearce* v. *Stines, 79 N. J. Eq. 51, 56,* seems also to bring the case within the opinion of the chief-justice in *Slack* v. *Rees, 66 N. J. Eq. 447.* In *Pearce* v. *Stines, supra,* the vice-chancellor, in commenting upon the proportion of the donor's property that must be disposed of by gift in order to bring it within the rule in *Slack* v. *Rees,* said: "The principle of the decision, as pointed out by Judge Vredenburgh, in *Coffey* v. *Sullivan, 63 N. J. Eq. 302,* is that a man enfeebled by age and disease may not unadvisedly divest himself of his property, at a time when he can no longer work, and when by so doing, he becomes dependent upon the charity of others or of the public. I think the practical rule to be deduced from the cases is that the donor, having barely sufficient property to sustain himself for the rest of his life, shall not irrevocably, and without advice, give away so much of it as to leave himself an object of charity.

"The law does not go to the length of saying that a donor incapacitated by age and disease from earning his own living, may not even improvidently strip himself of all his property beyond recall, although there are cases which seem almost to go to that extent (*Powell* v. *Powell* (*1900*), *1 Ch. Div. 246*) ; but it does say that his gift shall not stand, unless he have competent, independent advice, and refuse to act in accordance with it."

While the case clearly is within the rule laid down in *Haydock* v. *Haydock, supra,* because I have no confidence in the testimony of the defendants which was offered to show the absence of undue influence, yet, if the case was free from the inference of the influence which is condemned, it still is within the rule of *Slack* v. *Rees, supra,* if a single fact is proven, namely, the mental weakness of the complainant at the time the gift was made, all the other elements justifying the annulment of the gift plainly appearing.

The complainant's counsel should have offered medical testimony showing the nature of the disease, and its effect on the man, physically and mentally. No such evidence was produced. This omission, however, in the proof is not fatal, because the mental and physical condition of the complainant is so marked, and had continued for such a long period without change, that any layman, after a brief experience with him, could reach only one conclusion, viz., that the man was possessed of a very weak mind.

I will advise a decree that the deeds given in 1907 to vest the title in the complainant and the defendant Frances be declared null and void.

The Aldertons, in their answer and testimony, set up the trust upon which they took the property, and express a willingness to reconvey to the complainant and their daughter upon being reimbursed. On this branch of the case there will be a reference to a master to ascertain the sums with which the Aldertons should be charged for use and occupation of the premises, and what credits should be allowed them for necessary expenditures for the care and preservation of the property, the payment of taxes, water rents, interest and dues upon the build-

ing loan mortgage, &c.—the form and scope of the order to be settled on notice.

Upon the coming in of the master's report the decree will additionally provide that the Aldertons convey the premises to the complainant upon the payment to them of the amount, if any, so ascertained to be due.